

Squire Patton Boggs (US) LLP
717 17th Street, Suite 1825
Denver, Colorado 80202

O  +1 303 830 1776
F  +1 303 894 9239
squirepattonboggs.com

Keith Bradley
T  +1 303 894 6156
keith.bradley@squirepb.com

July 2, 2024

Maria R. Hamilton, Clerk of Court
United States Court of Appeals for the First Circuit
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2500
Boston, MA 02210

Re:  ***U.S. v. Ernst Jacob GmbH & Co. KG, et al.***, No. 23-1969
　　　FRAP Rule 28(j) Letter

Dear Ms. Hamilton:

Appellants[1] contend the decision below contravened Article III, because the court allowed a purported Coast Guard determination to establish liability for natural resources damages instead of the court.  The relief granted is structurally similar to non-statutory damages at law; civil penalties for an oil spill is a legal claim incurring a jury-trial right, and courts have held the same for cleanup costs.  Br. 53-54 (citing *Tull* v. *United States*, 481 U.S. 412 (1987), and *United States* v. *E.R.R., LLC*, 35 F.4th 405 (5th Cir. 2022).  Appellants observed that even when the law permits an adjudication by an administrative agency, such adjudication can only be done where the statute establishes procedures comparable to litigation.  Br. 53.

A recent Supreme Court decision reinforces and strengthens appellants' Article III objection and suggests that determinations as below for civil

---

[1] Appellant EJ has authorized SIGCo to represent that EJ joins this letter.

damages are the sole prerogative of the court. Per *SEC* v. *Jarkesy*, No. 22-859 (U.S. June 27, 2024), when the SEC enforces the Securities Exchange Act by seeking civil penalties against fraud, the respondent is entitled to an Article III court, and specifically a jury. More broadly, *Jarkesy* explained that Congress cannot "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." Slip op. at 18 (citation omitted). The exceptions to this rule, under *Jarkesy*, involve "certain . . . historic categories of adjudications," such as immigration, tax, and patents. *Id.* at 17. Alleged damages to natural resources flowing from from a vessel grounding are not among them.

Moreover, the Court elaborated on the role a court must play, on claims for which Article III guarantees the availability of a court. For such claims, "involvement by an Article III court in the *initial adjudication* is necessary." *Id.* at 14 (emphasis added). That is exactly what the lower court denied to appellants. It refused to conduct the initial adjudication of liability, and held instead that the Coast Guard's purported determination established conclusively appellants' liability for damages.

Sincerely,
/s Keith Bradley
Keith Bradley

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SECURITIES AND EXCHANGE COMMISSION *v.* JARKESY ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 22–859.   Argued November 29, 2023—Decided June 27, 2024

In the aftermath of the Wall Street Crash of 1929, Congress passed a suite of laws designed to combat securities fraud and increase market transparency. Three such statues are relevant: The Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940. These Acts respectively govern the registration of securities, the trading of securities, and the activities of investment advisers. Although each regulates different aspects of the securities markets, their pertinent provisions—collectively referred to by regulators as "the antifraud provisions," App. to Pet. for Cert. 73a, 202a—target the same basic behavior: misrepresenting or concealing material facts.

To enforce these Acts, Congress created the Securities and Exchange Commission. The SEC may bring an enforcement action in one of two forums. It can file suit in federal court, or it can adjudicate the matter itself. The forum the SEC selects dictates certain aspects of the litigation. In federal court, a jury finds the facts, an Article III judge presides, and the Federal Rules of Evidence and the ordinary rules of discovery govern the litigation. But when the SEC adjudicates the matter in-house, there are no juries. The Commission presides while its Division of Enforcement prosecutes the case. The Commission or its delegee—typically an Administrative Law Judge—also finds facts and decides discovery disputes, and the SEC's Rules of Practice govern.

One remedy for securities violations is civil penalties. Originally, the SEC could only obtain civil penalties from unregistered investment advisers in federal court. Then, in 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act. The Act authorized the SEC to impose such penalties through its own in-house

proceedings.

Shortly after passage of the Dodd-Frank Act, the SEC initiated an enforcement action for civil penalties against investment adviser George Jarkesy, Jr., and his firm, Patriot28, LLC for alleged violations of the "antifraud provisions" contained in the federal securities laws. The SEC opted to adjudicate the matter in-house. As relevant, the final order determined that Jarkesy and Patriot28 had committed securities violations and levied a civil penalty of $300,000. Jarkesy and Patriot28 petitioned for judicial review. The Fifth Circuit vacated the order on the ground that adjudicating the matter in-house violated the defendants' Seventh Amendment right to a jury trial.

*Held*: When the SEC seeks civil penalties against a defendant for securities fraud, the Seventh Amendment entitles the defendant to a jury trial. Pp. 6–27.

(a) The question presented by this case—whether the Seventh Amendment entitles a defendant to a jury trial when the SEC seeks civil penalties for securities fraud—is straightforward. Following the analysis set forth in *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33, and *Tull* v. *United States*, 481 U. S. 412, this action implicates the Seventh Amendment because the SEC's antifraud provisions replicate common law fraud. And the "public rights" exception to Article III jurisdiction does not apply, because the present action does not fall within any of the distinctive areas involving governmental prerogatives where the Court has concluded that a matter may be resolved outside of an Article III court, without a jury.

(b) The Court first explains why this action implicates the Seventh Amendment.

(1) The right to trial by jury is "of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right" has always been and "should be scrutinized with the utmost care." *Dimick* v. *Schiedt*, 293 U. S. 474, 486. When the British attempted to evade American juries by siphoning adjudications to juryless admiralty, vice admiralty, and chancery courts, the Americans protested and eventually cited the British practice as a justification for declaring Independence. In the Revolution's aftermath, concerns that the proposed Constitution lacked a provision guaranteeing a jury trial right in civil cases was perhaps the "most success[ful]" critique leveled against the document during the ratification debates. The Federalist No. 83, p. 495. To fix that flaw, the Framers promptly adopted the Seventh Amendment. Ever since, "every encroachment upon [the jury trial right] has been watched with great jealousy." *Parsons* v. *Bedford*, 3 Pet. 433, 446. Pp. 7–8.

(2) The Seventh Amendment guarantees that in "[s]uits at common law . . . the right of trial by jury shall be preserved." The right

itself is not limited to the "common-law forms of action recognized" when the Seventh Amendment was ratified. *Curtis* v. *Loether*, 415 U. S. 189, 193. Rather, it "embrace[s] all suits which are not of equity or admiralty jurisdiction, whatever may be the peculiar form which they may assume." *Parsons*, 3 Pet., at 447. That includes statutory claims that are "legal in nature." *Granfinanciera*, 492 U. S., at 53.
To determine whether a suit is legal in nature, courts must consider whether the cause of action resembles common law causes of action, and whether the remedy is the sort that was traditionally obtained in a court of law. Of these factors, the remedy is the more important. And in this case, the remedy is all but dispositive. For respondents' alleged fraud, the SEC seeks civil penalties, a form of monetary relief. Such relief is legal in nature when it is designed to punish or deter the wrongdoer rather than solely to "restore the status quo." *Tull*, 481 U. S., at 422. The Acts condition the availability and size of the civil penalties available to the SEC based on considerations such as culpability, deterrence, and recidivism. See §§77h–1; 78u–2, 80b–3. These factors go beyond restoring the status quo and so are legal in nature. The SEC is also not obligated to use civil penalties to compensate victims. SEC civil penalties are thus "a type of remedy at common law that could only be enforced in courts of law." *Tull*, 481 U. S., at 422. This suit implicates the Seventh Amendment right and a defendant would be entitled to a jury on these claims.

The close relationship between federal securities fraud and common law fraud confirms that conclusion. Both target the same basic conduct: misrepresenting or concealing material facts. By using "fraud" and other common law terms of art when it drafted the federal securities laws, Congress incorporated common law fraud prohibitions into those laws. This Court therefore often considers common law fraud principles when interpreting federal securities law. See, *e.g., Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U. S. 336, 343–344. While federal securities fraud and common law fraud are not identical, the close relationship between the two confirms that this action is "legal in nature." *Granfinanciera*, 492 U. S., at 53. Pp. 8–13.

(c) Because the claims at issue here implicate the Seventh Amendment, a jury trial is required unless the "public rights" exception applies. Under this exception, Congress may assign the matter for decision to an agency without a jury, consistent with the Seventh Amendment. For the reasons below, the exception does not apply. Pp. 13–27.

(1) The Constitution prevents Congress from "withdraw[ing] from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law." *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 284. Once such a suit "is brought within

the bounds of federal jurisdiction," an Article III court must decide it, with a jury if the Seventh Amendment applies. *Stern* v. *Marshall*, 564 U. S. 462, 484. On that basis, this Court has repeatedly explained that matters concerning private rights may not be removed from Article III courts. See, *e.g., Murray's Lessee,* 18 How., at 284. If a suit is in the nature of an action at common law, then the matter presumptively concerns private rights, and adjudication by an Article III court is mandatory. *Stern*, 564 U. S., at 484.

The Court also recognizes a class of cases concerning "public rights." Such matters "historically could have been determined exclusively by [the executive and legislative] branches." *Id.,* at 493 (internal quotation marks omitted). No involvement by an Article III court in the initial adjudication of public rights claims is necessary. Certain categories that have been recognized as falling within the exception include matters concerning: the collection of revenue; aspects of customs law; immigration law; relations with Indian tribes; the administration of public lands; and the granting of public benefits. The Court's opinions governing this exception have not always spoken in precise terms. But "even with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Article III courts." *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 69, n. 23 (plurality opinion). Pp. 13–18.

(2) In *Granfinanciera*, this Court previously considered whether the Seventh Amendment guarantees the right to a jury trial "in the face of Congress' decision to allow a non-Article III tribunal to adjudicate" a statutory "fraud claim." 492 U. S., at 37, 50. There the issue was whether Congress's designation of fraudulent conveyance actions as "core [bankruptcy] proceedings" authorized non-Article III bankruptcy judges to hear them without juries. *Id.*, at 50. The Court held that the designation was not permissible, even under the public rights exception. To determine whether the claim implicated the Seventh Amendment, the Court applied the principles distilled in *Tull.* Surveying English cases and considering the remedy these suits provided, the Court concluded that fraudulent conveyance actions were "quintessentially suits at common law." *Granfinanciera*, 492 U. S., at 56. Because these actions were akin to "suits at common law" and were not "closely intertwined" with the bankruptcy process, the Court held that the public rights exception did not apply, and a jury was required. *Id.*, at 54, 56. Pp. 19–20.

(3) *Granfinanciera* effectively decides this case. The action here was brought under the "anti-fraud provisions" of the federal securities laws and provide civil penalties that can "only be enforced in courts of law." *Tull*, 481 U. S., at 422. They target the same basic conduct as

common law fraud, employ the same terms of art, and operate pursuant to similar legal principles. In short, this action involves a "matter[ ] of private rather than public right." *Granfinanciera*, 492 U. S., at 56. Pp. 20–21.

 (4) The SEC claims that the public rights exception applies because Congress created "new statutory obligations, impose[d] civil penalties for their violation, and then commit[ted] to an administrative agency the function of deciding whether a violation ha[d] in fact occurred." Brief for Petitioner 21. *Granfinanciera* does away with much of the SEC's argument. Congress cannot "conjure away the Seventh Amendment by mandating that traditional legal claims be . . . taken to an administrative tribunal." 492 U. S., at 52. The SEC's argument that *Granfinanciera* does not apply because the Government is the party bringing this action also fails. What matters is the substance of the suit, not where it is brought, who brings it, or how it is labeled. *Northern Pipeline Constr. Co.*, 458 U. S., at 69 n. 23 (plurality opinion). Pp. 21–22.

 (5) The Court's opinion in *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n*, 430 U. S. 442, is not to the contrary. The litigation in that case arose under the Occupational Health and Safety Act. Facing agency enforcement actions, two employers alleged that the agency's adjudicatory authority violated the Seventh Amendment. See *id.,* at 448–449. The Court concluded that Congress could assign the OSH Act adjudications to an agency because the claims involved "a new cause of action, and remedies therefor, unknown to the common law." *Id.,* at 461. The cases *Atlas Roofing* relied upon applied the "public rights" exception to actions that were "'not . . . suit[s] at common law or in the nature of such . . . suit[s].'" *Id.,* at 453. *Atlas Roofing* therefore does not apply here, where the statutory claim is "'in the nature of'" a common law suit. *Id.,* at 453. Later rulings also foreclose reading *Atlas Roofing* as the SEC does. This Court clarified in *Tull* that the Seventh Amendment does apply to novel statutory regimes, so long as the statutory claims are akin to common law claims. See 481 U. S., at 421–423. And the Court has explained that the public rights exception does not apply automatically whenever Congress assigns a matter to an agency for adjudication. See *Granfinanciera*, 492 U. S., at 52. Pp. 22–27.

 The Court does not reach the remaining issues in this case.

34 F. 4th 446, affirmed and remanded.

 ROBERTS, C. J., delivered the opinion of the Court, in which THOMAS, ALITO, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. GORSUCH, J., filed a concurring opinion, in which THOMAS, J., joined. SOTOMAYOR, J., filed a dissenting opinion, in which KAGAN and JACKSON, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–859

_____

## SECURITIES AND EXCHANGE COMMISSION, PETITIONER *v.* GEORGE R. JARKESY, JR., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 27, 2024]

CHIEF JUSTICE ROBERTS delivered the opinion of the
Court.

In 2013, the Securities and Exchange Commission initi-
ated an enforcement action against respondents George
Jarkesy, Jr., and Patriot28, LLC, seeking civil penalties for
alleged securities fraud. The SEC chose to adjudicate the
matter in-house before one of its administrative law judges,
rather than in federal court where respondents could have
proceeded before a jury. We consider whether the Seventh
Amendment permits the SEC to compel respondents to de-
fend themselves before the agency rather than before a jury
in federal court.

## I
### A

In the aftermath of the Wall Street Crash of 1929, Con-
gress passed a suite of laws designed to combat securities
fraud and increase market transparency. Three such stat-
ues are relevant here: The Securities Act of 1933, the Secu-
rities Exchange Act of 1934, and the Investment Advisers
Act of 1940. 48 Stat. 74, 15 U. S. C. §§77a *et seq*.; 48 Stat.

881, 78a *et seq*.; 54 Stat. 847, 80b–1 *et seq*. These Acts respectively govern the registration of securities, the trading of securities, and the activities of investment advisers. Their protections are mutually reinforcing and often overlap. See *Lorenzo* v. *SEC*, 587 U. S. 71, 80 (2019). Although each regulates different aspects of the securities markets, their pertinent provisions—collectively referred to by regulators as "the antifraud provisions," App. to Pet. for Cert. 73a, 202a—target the same basic behavior: misrepresenting or concealing material facts.

The three antifraud provisions are Section 17(a) of the Securities Act, Section 10(b) of the Securities Exchange Act, and Section 206 of the Investment Advisers Act. Section 17(a) prohibits regulated individuals from "obtain[ing] money or property by means of any untrue statement of a material fact," as well as causing certain omissions of material fact. 15 U. S. C. §77q(a)(2). As implemented by Rule 10b–5, Section 10(b) prohibits using "any device, scheme, or artifice to defraud," making "untrue statement[s] of . . . material fact," causing certain material omissions, and "engag[ing] in any act . . . which operates or would operate as a fraud." 17 CFR §240.10b–5 (2023); see 15 U. S. C. §78j(b). And finally, Section 206(b), as implemented by Rule 206(4)–8, prohibits investment advisers from making "any untrue statement of a material fact" or engaging in "fraudulent, deceptive, or manipulative" acts with respect to investors or prospective investors. 17 CFR §§275.206(4)–8(a)(1), (2); see 15 U. S. C. §80b–6(4).

To enforce these Acts, Congress created the SEC. The SEC may bring an enforcement action in one of two forums. First, the Commission can adjudicate the matter itself. See §§77h–1, 78u–2, 78u–3, 80b–3. Alternatively, it can file a suit in federal court. See §§77t, 78u, 80b–9. The SEC's choice of forum dictates two aspects of the litigation: The procedural protections enjoyed by the defendant, and the remedies available to the SEC.

Procedurally, these forums differ in who presides and makes legal determinations, what evidentiary and discovery rules apply, and who finds facts. Most pertinently, in federal court a jury finds the facts, depending on the nature of the claim. See U. S. Const., Amdt. 7. In addition, a life-tenured, salary-protected Article III judge presides, see Art. III, §1, and the litigation is governed by the Federal Rules of Evidence and the ordinary rules of discovery.

Conversely, when the SEC adjudicates the matter in-house, there are no juries. Instead, the Commission presides and finds facts while its Division of Enforcement prosecutes the case. The Commission may also delegate its role as judge and factfinder to one of its members or to an administrative law judge (ALJ) that it employs. See 15 U. S. C. §78d–1. In these proceedings, the Commission or its delegee decides discovery disputes, see, *e.g.*, 17 CFR §201.232(b), and the SEC's Rules of Practice govern, see 17 CFR §201.100 *et seq.* The Commission or its delegee also determines the scope and form of permissible evidence and may admit hearsay and other testimony that would be inadmissible in federal court. See §§201.320, 201.326.

When a Commission member or an ALJ presides, the full Commission can review that official's findings and conclusions, but it is not obligated to do so. See §201.360; 15 U. S. C. §78d–1. Judicial review is also available once the proceedings have concluded. See §§77i(a), 78y(a)(1), 80b–13(a). But such review is deferential. By law, a reviewing court must treat the agency's factual findings as "conclusive" if sufficiently supported by the record, *e.g.*, §78y(a)(4); see *Richardson* v. *Perales*, 402 U. S. 389, 401 (1971), even when they rest on evidence that could not have been admitted in federal court.

The remedy at issue in this case, civil penalties, also originally depended upon the forum chosen by the SEC. Except in cases against registered entities, the SEC could obtain civil penalties only in federal court. See Insider Trading

Sanctions Act of 1984, §2, 98 Stat. 1264; Securities Enforce-
ment Remedies and Penny Stock Reform Act of 1990, §§101,
201–202, 104 Stat. 932–933, 935–938.  That is no longer so.
In 2010, Congress passed the Dodd-Frank Wall Street Re-
form and Consumer Protection Act (Dodd-Frank Act), 124
Stat. 1376.  That Act "ma[de] the SEC's authority in admin-
istrative penalty proceedings coextensive with its authority
to seek penalties in Federal court."  H. R. Rep. No. 111–687,
p. 78 (2010).  In other words, the SEC may now seek civil
penalties in federal court, or it may impose them through
its own in-house proceedings.   See Dodd-Frank Act,
§929P(a), 124 Stat. 1862–1864 (codified in relevant part as
amended at 15 U. S. C. §§77h–1(g), 78u–2(a), 80b–3(i)(1)).

   Civil penalties rank among the SEC's most potent en-
forcement tools.  These penalties consist of fines of up to
$725,000 per violation.  See §§77h–1(g), 78u–2, 80b–3(i).
And the SEC may levy these penalties even when no inves-
tor has actually suffered financial loss.  See *SEC* v. *Blavin*,
760 F. 2d 706, 711 (CA6 1985) (*per curiam*).

## B

   Shortly after passage of the Dodd-Frank Act, the SEC be-
gan investigating Jarkesy and Patriot28 for securities
fraud.  Between 2007 and 2010, Jarkesy launched two in-
vestment funds, raising about $24 million from 120 "accred-
ited" investors—a class of investors that includes, for exam-
ple, financial institutions, certain investment professionals,
and high net worth individuals.  App. to Pet. for Cert. 72a–
73a, 110a, n. 72; see 17 CFR §230.501.  Patriot28, which
Jarkesy managed, served as the funds' investment adviser.
According to the SEC, Jarkesy and Patriot28 misled inves-
tors in at least three ways: (1) by misrepresenting the in-
vestment strategies that Jarkesy and Patriot28 employed,
(2) by lying about the identity of the funds' auditor and
prime broker, and (3) by inflating the funds' claimed value

so that Jarkesy and Patriot28 could collect larger management fees. App. to Pet. for Cert. 80a–86a, 95a–105a. The SEC initiated an enforcement action, contending that these actions violated the antifraud provisions of the Securities Act, the Securities Exchange Act, and the Investment Advisers Act, and sought civil penalties and other remedies.

Relying on the new authority conferred by the Dodd-Frank Act, the SEC opted to adjudicate the matter itself rather than in federal court. In 2014, the presiding ALJ issued an initial decision. *Id.*, at 155a–225a. The SEC reviewed the decision and then released its final order in 2020. *Id.*, at 71a–154a. The final order levied a civil penalty of $300,000 against Jarkesy and Patriot28, directed them to cease and desist committing or causing violations of the antifraud provisions, ordered Patriot28 to disgorge earnings, and prohibited Jarkesy from participating in the securities industry and in offerings of penny stocks. *Id.*, at 152a–154a.

Jarkesy and Patriot28 petitioned for judicial review. 34 F. 4th 446, 450 (CA5 2022). A divided panel of the Fifth Circuit granted their petition and vacated the final order. *Id.*, at 449–450. Applying a two-part test from *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33 (1989), the panel held that the agency's decision to adjudicate the matter in-house violated Jarkesy's and Patriot28's Seventh Amendment right to a jury trial. 34 F. 4th, at 451. First, the panel determined that because these SEC antifraud claims were "akin to [a] traditional action[] in debt," a jury trial would be required if this case were brought in an Article III court. *Id.*, at 454; see *id.*, at 453–455. It then considered whether the "public rights" exception applied. That exception permits Congress, under certain circumstances, to assign an action to an agency tribunal without a jury, consistent with the Seventh Amendment. See *id.*, at 455–459. The panel concluded that the exception did not apply, and that therefore the case should have been brought in federal court,

where a jury could have found the facts pertinent to the defendants' fraud liability. Based on this Seventh Amendment violation, the panel vacated the final order. *Id.*, at 459.

It also identified two further constitutional problems. First, it determined that Congress had violated the nondelegation doctrine by authorizing the SEC, without adequate guidance, to choose whether to litigate this action in an Article III court or to adjudicate the matter itself. See *id.*, at 459–463. The panel also found that the insulation of the SEC ALJs from executive supervision with two layers of for-cause removal protections violated the separation of powers. See *id.*, at 463–466. Judge Davis dissented. *Id.*, at 466–479. The Fifth Circuit denied rehearing en banc, 51 F. 4th 644 (2022), and we granted certiorari, 600 U. S. ___ (2023).

## II

This case poses a straightforward question: whether the Seventh Amendment entitles a defendant to a jury trial when the SEC seeks civil penalties against him for securities fraud. Our analysis of this question follows the approach set forth in *Granfinanciera* and *Tull* v. *United States*, 481 U. S. 412 (1987). The threshold issue is whether this action implicates the Seventh Amendment. It does. The SEC's antifraud provisions replicate common law fraud, and it is well established that common law claims must be heard by a jury.

Since this case does implicate the Seventh Amendment, we next consider whether the "public rights" exception to Article III jurisdiction applies. This exception has been held to permit Congress to assign certain matters to agencies for adjudication even though such proceedings would not afford the right to a jury trial. The exception does not apply here because the present action does not fall within

any of the distinctive areas involving governmental preroga-tives where the Court has concluded that a matter may be resolved outside of an Article III court, without a jury. The Seventh Amendment therefore applies and a jury is re-quired. Since the answer to the jury trial question resolves this case, we do not reach the nondelegation or removal is-sues.

## A

We first explain why this action implicates the Seventh Amendment.

### 1

The right to trial by jury is "of such importance and occu-pies so firm a place in our history and jurisprudence that any seeming curtailment of the right" has always been and "should be scrutinized with the utmost care." *Dimick* v. *Schiedt*, 293 U. S. 474, 486 (1935). Commentators recog-nized the right as "the glory of the English law," 3 W. Black-stone, Commentaries on the Laws of England 379 (8th ed. 1778) (Blackstone), and it was prized by the American colo-nists. When the English began evading American juries by siphoning adjudications to juryless admiralty, vice admi-ralty, and chancery courts, Americans condemned Parlia-ment for "subvert[ing] the rights and liberties of the colo-nists." Resolutions of the Stamp Act Congress, Art. VIII (Oct. 19, 1765), reprinted in Sources of Our Liberties 270, 271 (R. Perry & J. Cooper eds. 1959). Representatives gath-ered at the First Continental Congress demanded that Par-liament respect the "great and inestimable privilege of be-ing tried by their peers of the vicinage, according to the [common] law." 1 Journals of the Continental Congress, 1774–1789, p. 69 (Oct. 14, 1774) (W. Ford ed. 1904). And when the English continued to try Americans without ju-ries, the Founders cited the practice as a justification for

severing our ties to England. See Declaration of Independence ¶20; see generally *Erlinger* v. *United States*, 602 U. S. ___, ___–___ (2024).

In the Revolution's aftermath, perhaps the "most success[ful]" critique leveled against the proposed Constitution was its "want of a . . . provision for the trial by jury in civil cases." The Federalist No. 83, p. 495 (C. Rossiter ed. 1961) (A. Hamilton) (emphasis deleted). The Framers promptly adopted the Seventh Amendment to fix that flaw. In so doing, they "embedded" the right in the Constitution, securing it "against the passing demands of expediency or convenience." *Reid* v. *Covert*, 354 U. S. 1, 10 (1957) (plurality opinion). Since then, "every encroachment upon it has been watched with great jealousy." *Parsons* v. *Bedford*, 3 Pet. 433, 446 (1830).

2

By its text, the Seventh Amendment guarantees that in "[s]uits at common law, . . . the right of trial by jury shall be preserved." In construing this language, we have noted that the right is not limited to the "common-law forms of action recognized" when the Seventh Amendment was ratified. *Curtis* v. *Loether*, 415 U. S. 189, 193 (1974). As Justice Story explained, the Framers used the term "common law" in the Amendment "in contradistinction to equity, and admiralty, and maritime jurisprudence." *Parsons*, 3 Pet., at 446. The Amendment therefore "embrace[s] all suits which are not of equity or admiralty jurisdiction, whatever may be the peculiar form which they may assume." *Id.*, at 447.

The Seventh Amendment extends to a particular statutory claim if the claim is "legal in nature." *Granfinanciera*, 492 U. S., at 53. As we made clear in *Tull*, whether that claim is statutory is immaterial to this analysis. See 481 U. S., at 414–415, 417–425. In that case, the Government sued a real estate developer for civil penalties in federal

court.  The developer responded by invoking his right to a jury trial.  Although the cause of action arose under the Clean Water Act, the Court surveyed early cases to show that the statutory nature of the claim was not legally relevant.  "Actions by the Government to recover civil penalties under statutory provisions," we explained, "historically ha[d] been viewed as [a] type of action in debt requiring trial by jury."  *Id.*, at 418–419.  To determine whether a suit is legal in nature, we directed courts to consider the cause of action and the remedy it provides.  Since some causes of action sound in both law and equity, we concluded that the remedy was the "more important" consideration.  *Id.*, at 421 (brackets and internal quotation marks omitted); see *id.*, at 418–421.

In this case, the remedy is all but dispositive.  For respondents' alleged fraud, the SEC seeks civil penalties, a form of monetary relief.  While monetary relief can be legal or equitable, money damages are the prototypical common law remedy.  See *Mertens* v. *Hewitt Associates*, 508 U. S. 248, 255 (1993).  What determines whether a monetary remedy is legal is if it is designed to punish or deter the wrongdoer, or, on the other hand, solely to "restore the status quo."  *Tull*, 481 U. S., at 422.  As we have previously explained, "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment."  *Austin* v. *United States*, 509 U. S. 602, 610 (1993) (internal quotation marks omitted).  And while courts of equity could order a defendant to return unjustly obtained funds, only courts of law issued monetary penalties to "punish culpable individuals."  *Tull*, 481 U. S., at 422.  Applying these principles, we have recognized that "civil penalt[ies are] a type of remedy at common law that could only be enforced in courts of law."  *Ibid.*  The same is true here.

To start, the Securities Exchange Act and the Investment

Advisers Act condition the availability of civil penalties on six statutory factors: (1) whether the alleged misconduct involved fraud, deceit, manipulation, or deliberate or reckless disregard for regulatory requirements, (2) whether it caused harm, (3) whether it resulted in unjust enrichment, accounting for any restitution made, (4) whether the defendant had previously violated securities laws or regulations, or had previously committed certain crimes, (5) the need for deterrence, and (6) other "matters as justice may require." §§78u–2(c), 80b–3(i)(3). Of these, several concern culpability, deterrence, and recidivism. Because they tie the availability of civil penalties to the perceived need to punish the defendant rather than to restore the victim, such considerations are legal rather than equitable.

The same is true of the criteria that determine the size of the available remedy. The Securities Act, the Securities Exchange Act, and the Investment Advisers Act establish three "tiers" of civil penalties. See §§77h–1(g)(2), 78u–2(b), 80b–3(i)(2). Violating a federal securities law or regulation exposes a defendant to a first tier penalty. A second tier penalty may be ordered if the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard for regulatory requirements. Finally, if those acts also resulted in substantial gains to the defendant or losses to another, or created a "significant risk" of the latter, the defendant is subject to a third tier penalty. Each successive tier authorizes a larger monetary sanction. See *ibid.*

Like the considerations that determine the availability of civil penalties in the first place, the criteria that divide these tiers are also legal in nature. Each tier conditions the available penalty on the culpability of the defendant and the need for deterrence, not the size of the harm that must be remedied. Indeed, showing that a victim suffered harm is not even required to advance a defendant from one tier to the next. Since nothing in this analysis turns on "restor[ing] the status quo," *Tull*, 481 U. S., at 422, these factors

show that these civil penalties are designed to be punitive.

The final proof that this remedy is punitive is that the SEC is not obligated to return any money to victims. See *id.*, at 422–423. Although the SEC can choose to compensate injured shareholders from the civil penalties it collects, see 15 U. S. C. §7246(a), it admits that it is not required to do so, see App. to Pet. for Cert. 124a, n. 116 (citing 17 CFR §201.1100). Such a penalty by definition does not "restore the status quo" and can make no pretense of being equitable. *Tull*, 481 U. S., at 422.

In sum, the civil penalties in this case are designed to punish and deter, not to compensate. They are therefore "a type of remedy at common law that could only be enforced in courts of law." *Ibid.* That conclusion effectively decides that this suit implicates the Seventh Amendment right, and that a defendant would be entitled to a jury on these claims. See *id.*, at 421–423.

The close relationship between the causes of action in this case and common law fraud confirms that conclusion. Both target the same basic conduct: misrepresenting or concealing material facts. Compare 15 U. S. C. §§77q(a)(2), 78j(b), 80b–6(4); 17 CFR §§240.10b–5(b), 275.206(4)–8(a)(1), with Restatement (Third) of Torts: Liability for Economic Harm, §§9, 13 (2018); see also, *e.g.*, *Pauwels* v. *Deloitte LLP*, 83 F. 4th 171, 189–190 (CA2 2023) (identifying the elements of common law fraud under New York law); *Conroy* v. *Regents of Univ. of Cal.*, 45 Cal. 4th 1244, 1254–1255, 203 P. 3d 1127, 1135 (2009) (same for California law); *Wesdem, L.L.C.* v. *Illinois Tool Works, Inc.*, 70 F. 4th 285, 291 (CA5 2023) (same for Texas law). That is no accident. Congress deliberately used "fraud" and other common law terms of art in the Securities Act, the Securities Exchange Act, and the Investment Advisers Act. *E.g.*, 15 U. S. C. §77q(a)(3) (prohibiting any practice "which operates . . . as a fraud"). In so doing, Congress incorporated prohibitions from common law fraud into federal securities law. The SEC has followed

suit in rulemakings. Rule 10b–5, for example, prohibits "any device, scheme, or artifice to defraud," and "engag[ing] in any act . . . which operates or would operate as a fraud." 17 CFR §§240.10b–5(a), (c).

Congress's decision to draw upon common law fraud created an enduring link between federal securities fraud and its common law "ancestor." *Foster* v. *Wilson*, 504 F. 3d 1046, 1050 (CA9 2007). "[W]hen Congress transplants a common-law term, the old soil comes with it." *United States* v. *Hansen*, 599 U. S. 762, 778 (2023) (internal quotation marks omitted). Our precedents therefore often consider common law fraud principles when interpreting federal securities law. *E.g.*, *Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U. S. 336, 343–344 (2005) (evaluating pleading requirements in light of the "common-law roots of the securities fraud action"); *Schreiber* v. *Burlington Northern, Inc.*, 472 U. S. 1, 7 (1985) ("The meaning the Court has given the term 'manipulative' [in §10b of the Securities Exchange Act] is consistent with the use of the term at common law . . . ." (footnote omitted)); *Chiarella* v. *United States*, 445 U. S. 222, 227–229 (1980) (explaining that insider trading liability under Rule 10b–5 is rooted in the common law duty of disclosure); *Basic Inc.* v. *Levinson*, 485 U. S. 224, 253 (1988) (White, J., concurring in part and dissenting in part) ("In general, the case law developed in this Court with respect to §10(b) and Rule 10b–5 has been based on doctrines with which we, as judges, are familiar: common-law doctrines of fraud and deceit.").

That is not to say that federal securities fraud and common law fraud are identical. In some respects, federal securities fraud is narrower. For example, federal securities law does not "convert every common-law fraud that happens to involve securities into a violation." *SEC* v. *Zandford*, 535 U. S. 813, 820 (2002). It only targets certain subject matter and certain disclosures. In other respects,

federal securities fraud is broader. For example, federal securities fraud employs the burden of proof typical in civil cases, while its common law analogue traditionally used a more stringent standard. See *Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 387–390 (1983). Courts have also not typically interpreted federal securities fraud to require a showing of harm to be actionable by the SEC. See, *e.g.*, *Blavin*, 760 F. 2d, at 711; *SEC* v. *Life Partners Holdings, Inc.*, 854 F. 3d 765, 779 (CA5 2017). Nevertheless, the close relationship between federal securities fraud and common law fraud confirms that this action is "legal in nature." *Granfinanciera*, 492 U. S., at 53.

### B

#### 1

Although the claims at issue here implicate the Seventh Amendment, the Government and the dissent argue that a jury trial is not required because the "public rights" exception applies. Under this exception, Congress may assign the matter for decision to an agency without a jury, consistent with the Seventh Amendment. But this case does not fall within the exception, so Congress may not avoid a jury trial by preventing the case from being heard before an Article III tribunal.

The Constitution prohibits Congress from "withdraw[ing] from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law." *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 284 (1856). Once such a suit "is brought within the bounds of federal jurisdiction," an Article III court must decide it, with a jury if the Seventh Amendment applies. *Stern* v. *Marshall*, 564 U. S. 462, 484 (2011). These propositions are critical to maintaining the proper role of the Judiciary in the Constitution: "Under 'the basic concept of separation of powers . . . that flow[s] from the scheme of a tripartite government' adopted in the Constitution, 'the judicial Power of

the United States'" cannot be shared with the other branches. *Id.*, at 483 (quoting *United States* v. *Nixon*, 418 U. S. 683, 704 (1974); alteration in original). Or, as Alexander Hamilton wrote in The Federalist Papers, "'there is no liberty if the power of judging be not separated from the legislative and executive powers.'" The Federalist No. 78, at 466 (quoting 1 Montesquieu, The Spirit of Laws 181 (10th ed. 1773)).

On that basis, we have repeatedly explained that matters concerning private rights may not be removed from Article III courts. *Murray's Lessee*, 18 How., at 284; *Granfinanciera*, 492 U. S., at 51–52; *Stern*, 564 U. S., at 484. A hallmark that we have looked to in determining if a suit concerns private rights is whether it "is made of 'the stuff of the traditional actions at common law tried by the courts at Westminster in 1789.'" *Id.*, at 484 (quoting *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 90 (1982) (Rehnquist, J., concurring in judgment)). If a suit is in the nature of an action at common law, then the matter presumptively concerns private rights, and adjudication by an Article III court is mandatory. *Stern*, 564 U. S., at 484.

At the same time, our precedent has also recognized a class of cases concerning what we have called "public rights." Such matters "historically could have been determined exclusively by [the executive and legislative] branches," *id.*, at 493 (internal quotation marks omitted), even when they were "presented in such form that the judicial power [wa]s capable of acting on them," *Murray's Lessee*, 18 How., at 284. In contrast to common law claims, no involvement by an Article III court in the initial adjudication is necessary in such a case.

The decision that first recognized the public rights exception was *Murray's Lessee*. In that case, a federal customs collector failed to deliver public funds to the Treasury, so the Government issued a "warrant of distress" to compel him to produce the withheld sum. 18 How., at 274–275.

Pursuant to the warrant, the Government eventually seized and sold a plot of the collector's land. *Id.*, at 274. Plaintiffs later attacked the purchaser's title, arguing that the initial seizure was void because the Government had audited the collector's account and issued the warrant itself without judicial involvement. *Id.*, at 275.

The Court upheld the sale. It explained that pursuant to its power to collect revenue, the Government could rely on "summary proceedings" to compel its officers to "pay such balances of the public money" into the Treasury "as may be in their hands." *Id.*, at 281, 285. Indeed, the Court observed, there was an unbroken tradition—long predating the founding—of using these kinds of proceedings to "enforce payment of balances due from receivers of the revenue." *Id.*, at 278; see *id.*, at 281. In light of this historical practice, the Government could issue a valid warrant without intruding on the domain of the Judiciary. See *id.*, at 280–282. The challenge to the sale thus lacked merit.

This principle extends beyond cases involving the collection of revenue. In *Oceanic Steam Navigation Co.* v. *Stranahan*, 214 U. S. 320 (1909), we considered the imposition of a monetary penalty on a steamship company. Pursuant to its plenary power over immigration, Congress had excluded immigration by aliens afflicted with "loathsome or dangerous contagious diseases," and it authorized customs collectors to enforce the prohibition with fines. *Id.*, at 331–334. When a steamship company challenged the penalty under Article III, we upheld it. Congress's power over foreign commerce, we explained, was so total that no party had a "'vested right'" to import anything into the country. *Id.*, at 335 (quoting *Buttfield* v. *Stranahan*, 192 U. S. 470, 493 (1904)). By the same token, Congress could also prohibit immigration by certain classes of persons and enforce those prohibitions with administrative penalties assessed without a jury. See *Oceanic Steam Navigation Co.*, 214 U. S., at

339–340.[1]

In *Ex parte Bakelite Corp.*, we upheld a law authorizing
the President to impose tariffs on goods imported by "unfair
methods of competition." 279 U. S. 438, 446 (1929). The
law permitted him to set whatever tariff was necessary,
subject to a statutory cap, to produce fair competition. If
the President was "satisfied the unfairness [was] extreme,"
the law even authorized him to "exclude[]" foreign goods en-
tirely. *Ibid.* Because the political branches had tradition-
ally held exclusive power over this field and had exercised

_____

[1] The dissent asserts that *Oceanic Steam Navigation* stands for the
proposition that the public rights exception applies to any exercise of
power granted to Congress. *Post*, at 10–11 (opinion of SOTOMAYOR, J). It
must be reading from a different case than we are. *Oceanic Steam Nav-
igation* expressly confines its analysis to the exercise of Congress's power
over *foreign* commerce. 214 U. S., at 339 ("It is insisted that the decisions
just stated and the legislative practices referred to are inapposite here,
because they all relate to subjects peculiarly within the authority of the
legislative department of the Government, and which, from the necessity
of things, required the concession that administrative officers should
have the authority to enforce designated penalties without resort to the
courts. But over no conceivable subject is the legislative power of Con-
gress more complete than it is over that with which the act we are now
considering deals."); *id.*, at 334 (explaining that the statute "rest[s] . . .
upon the authority of Congress over *foreign* commerce and its right to
control the coming of aliens into the United States" (emphasis added));
*id.*, at 340 (citing "the authority of Congress over the right to bring aliens
into the United States"); see *id.*, at 339 (discussing congressional power
over "the valuation of imported merchandise," "'importers,'" and "tar-
iff[s]" (quoting *Bartlett* v. *Kane*, 16 How. 263, 274 (1854)); 214 U. S., at
334 (expressly acknowledging and avoiding comment on "'limitations'"
of Congress's "'interstate commerce'" power because this case concerns
instead Congress's exercise of its "'plenary power in respect to the exclu-
sion of merchandise brought from *foreign* countries'" (quoting *Buttfield*
v. *Stranahan*, 192 U. S. 470, 492 (1904); emphasis added). Nowhere does
*Oceanic Steam Navigation* say that the public rights exception applies to
cases concerning the securities markets or interstate commerce more
broadly. The rules the dissent purports to locate in *Oceanic Steam Nav-
igation* are therefore wholly inapposite.

it, we explained that the assessment of tariffs did not implicate Article III.  *Id*., at 458, 460–461.

This Court has since held that certain other historic categories of adjudications fall within the exception, including relations with Indian tribes, see *United States* v. *Jicarilla Apache Nation*, 564 U. S. 162, 174 (2011), the administration of public lands, *Crowell* v. *Benson*, 285 U. S. 22, 51 (1932), and the granting of public benefits such as payments to veterans, *ibid*., pensions, *ibid*., and patent rights, *United States* v. *Duell*, 172 U. S. 576, 582–583 (1899).

Our opinions governing the public rights exception have not always spoken in precise terms.  This is an "area of frequently arcane distinctions and confusing precedents." *Thomas* v. *Union Carbide Agricultural Products Co.*, 473 U. S. 568, 583 (1985) (internal quotation marks omitted). The Court "has not 'definitively explained' the distinction between public and private rights," and we do not claim to do so today.  *Oil States Energy Services, LLC* v. *Greene's Energy Group, LLC*, 584 U. S. 325, 334 (2018).

Nevertheless, since *Murray's Lessee*, this Court has typically evaluated the legal basis for the assertion of the doctrine with care.  The public rights exception is, after all, an *exception*.  It has no textual basis in the Constitution and must therefore derive instead from background legal principles.  *Murray's Lessee* itself, for example, took pains to justify the application of the exception in that particular instance by explaining that it flowed from centuries-old rules concerning revenue collection by a sovereign.  See 18 How., at 281–285.  Without such close attention to the basis for each asserted application of the doctrine, the exception would swallow the rule.[2]

_____

[2] The dissent would brush away these careful distinctions and unfurl a new rule: that whenever Congress passes a statute "entitl[ing] the Government to civil penalties," the defendant's right to a jury and a neutral Article III adjudicator disappears.  See *post*, at 2 (opinion of SOTOMAYOR, J.).  It bases this rule not in the constitutional text (where it would find

From the beginning we have emphasized one point: "To avoid misconstruction upon so grave a subject, we think it proper to state that we do not consider congress can . . . withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Murray's Lessee*, 18 How., at 284. We have never embraced the proposition that "practical" considerations alone can justify extending the scope of the public rights exception to such matters. *Stern*, 564 U. S., at 501. "[E]ven with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Article III courts." *Northern Pipeline Constr. Co.*, 458 U. S., at 69, n. 23 (plurality opinion) (citing *Glidden Co.* v. *Zdanok*, 370 U. S. 530, 548–549, and n. 21 (1962) (plurality opinion)). And for good reason: "Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside

––––––––––
no foothold), nor in the ratification history (where again it would find no support), nor in a careful, category-by-category analysis of underlying legal principles of the sort performed by *Murray's Lessee* (which it does not attempt), nor even in a case-specific functional analysis (also not attempted). Instead, the dissent extrapolates from the outcomes in cases concerning unrelated applications of the public rights exception and from one opinion, *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n,* 430 U. S. 442 (1977). The result is to blur the distinctions our cases have drawn in favor of the legally unsound principle that just because the Government may extract civil penalties in administrative tribunals in some contexts, it must always be able to do so in all contexts.

The dissent also appeals to practice, ignoring that the statute Jarkesy and Patriot28 have been prosecuted under is barely over a decade old. It is also unclear how practice could transmute a private right into a public one, or how the absence of legal challenges brought by one generation could waive the individual rights of the next. Practice may be probative when it reflects the settled institutional understandings of the branches. That case is far weaker when the rights of individuals are directly at stake.

Article III." *Stern*, 564 U. S., at 484.

2

This is not the first time we have considered whether the Seventh Amendment guarantees the right to a jury trial "in the face of Congress' decision to allow a non-Article III tribunal to adjudicate" a statutory "fraud claim." 492 U. S., at 37, 50. We did so in *Granfinanciera*, and the principles identified in that case largely resolve this one.

*Granfinanciera* involved a statutory action for fraudulent conveyance. As codified in the Bankruptcy Code, the claim permitted a trustee to void a transfer or obligation made by the debtor before bankruptcy if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation." 11 U. S. C. §548(a)(2)(A) (1982 ed., Supp. V). Actions for fraudulent conveyance were well known at common law. 492 U. S., at 43. Even when Congress added these claims to the Bankruptcy Code in 1978, see 92 Stat. 2600, it preserved parties' rights to a trial by jury, 492 U. S., at 49–50. In 1984, however, Congress designated fraudulent conveyance actions "core [bankruptcy] proceedings" and authorized non-Article III bankruptcy judges to hear them without juries. *Id.*, at 50.

The issue in *Granfinanciera* was whether this designation was permissible under the public rights exception. *Ibid.* We explained that it was not. Although Congress had assigned fraudulent conveyance claims to bankruptcy courts, that assignment was not dispositive. See *id.*, at 52. What mattered, we explained, was the substance of the suit. "[T]raditional legal claims" must be decided by courts, "whether they originate in a newly fashioned regulatory scheme or possess a long line of common-law forebears." *Ibid.* To determine whether the claim implicated the Seventh Amendment, the Court applied the principles distilled in *Tull*. We examined whether the matter was "from [its] nature subject to 'a suit at common law.'" 492 U. S., at 56

(some internal quotation marks omitted); see *id.*, at 43–50. A survey of English cases showed that "actions to recover . . . fraudulent transfers were often brought at law in late 18th-century England." *Id.*, at 43. The remedy the trustee sought was also one "traditionally provided by law courts." *Id.*, at 49. Fraudulent conveyance actions were thus "quintessentially suits at common law." *Id.*, at 56.

We also considered whether these actions were "closely intertwined" with the bankruptcy regime. *Id.*, at 54. Some bankruptcy claims, such as "creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res," *id.*, at 56, are highly interdependent and require coordination. Resolving such claims fairly is only possible if they are all submitted at once to a single adjudicator. Otherwise, parties with lower priority claims can rush to the courthouse to seek payment before higher priority claims exhaust the estate, and an orderly disposition of a bankruptcy is impossible. Other claims, though, can be brought in standalone suits, because they are neither prioritized nor subordinated to related claims. Since fraudulent conveyance actions fall into that latter category, we concluded that these actions were not "closely intertwined" with the bankruptcy process. *Id.*, at 54. We also noted that Congress had already authorized jury trials for certain bankruptcy matters, demonstrating that jury trials were not generally "incompatible" with the overall regime. *Id.*, at 61–62 (internal quotation marks omitted).

We accordingly concluded that fraudulent conveyance actions were akin to "suits at common law" and were not inseparable from the bankruptcy process. *Id.*, at 54, 56. The public rights exception therefore did not apply, and a jury was required.

### 3

*Granfinanciera* effectively decides this case. Even when an action "originate[s] in a newly fashioned regulatory

scheme," what matters is the substance of the action, not where Congress has assigned it. *Id.*, at 52. And in this case, the substance points in only one direction.

According to the SEC, these are actions under the "antifraud provisions of the federal securities laws" for "fraudulent conduct." App. to Pet. for Cert. 72a–73a (opinion of the Commission). They provide civil penalties, a punitive remedy that we have recognized "could only be enforced in courts of law." *Tull*, 481 U. S., at 422. And they target the same basic conduct as common law fraud, employ the same terms of art, and operate pursuant to similar legal principles. See *supra*, at 10–12. In short, this action involves a "matter[] of private rather than public right." *Granfinanciera*, 492 U. S., at 56. Therefore, "Congress may not 'withdraw'" it "'from judicial cognizance.'" *Stern*, 564 U. S., at 484 (quoting *Murray's Lessee*, 18 How., at 284).

### 4

Notwithstanding *Granfinanciera*, the SEC contends the public rights exception still applies in this case because Congress created "new statutory obligations, impose[d] civil penalties for their violation, and then commit[ted] to an administrative agency the function of deciding whether a violation ha[d] in fact occurred." Brief for Petitioner 21 (internal quotation marks omitted).

The foregoing from *Granfinanciera* already does away with much of the SEC's argument. Congress cannot "conjure away the Seventh Amendment by mandating that traditional legal claims be . . . taken to an administrative tribunal." 492 U. S., at 52. Nor does the fact that the SEC action "originate[d] in a newly fashioned regulatory scheme" permit Congress to siphon this action away from an Article III court. *Ibid.* The constructive fraud claim in *Granfinanciera* was also statutory, see *id.*, at 37, but we nevertheless explained that the public rights exception did not apply. Again, if the action resembles a traditional legal

claim, its statutory origins are not dispositive. See *id.*, at 52, 56.

The SEC's sole remaining basis for distinguishing *Granfinanciera* is that the Government is the party prosecuting this action. See Brief for Petitioner 26–28; see also Tr. of Oral Arg. 25 (Principal Deputy Solicitor General) (the "critical distinction" in the public rights analysis is "enforcement by the executive"); *id.*, at 26 (identifying as "the constitutionally relevant distinction" that "this is something that has been assigned to a federal agency to enforce"). But we have never held that "the presence of the United States as a proper party to the proceeding is . . . sufficient" by itself to trigger the exception. *Northern Pipeline Constr. Co.*, 458 U. S., at 69, n. 23 (plurality opinion). Again, what matters is the substance of the suit, not where it is brought, who brings it, or how it is labeled. See *ibid.* The object of this SEC action is to regulate transactions between private individuals interacting in a pre-existing market. To do so, the Government has created claims whose causes of action are modeled on common law fraud and that provide a type of remedy available only in law courts. This is a common law suit in all but name. And such suits typically must be adjudicated in Article III courts.

### 5

The principal case on which the SEC and the dissent rely is *Atlas Roofing Co.* v. *Occupational Safety and Health Review Commission*, 430 U. S. 442 (1977). Because the public rights exception as construed in *Atlas Roofing* does not extend to these civil penalty suits for fraud, that case does not control. And for that same reason, we need not reach the suggestion made by Jarkesy and Patriot28 that *Tull* and *Granfinanciera* effectively overruled *Atlas Roofing* to the extent that case construed the public rights exception to allow the adjudication of civil penalty suits in administrative

tribunals.[3]

The litigation in *Atlas Roofing* arose under the Occupational Safety and Health Act of 1970 (OSH Act), a federal regulatory regime created to promote safe working conditions. *Id.*, at 444–445. The Act authorized the Secretary of Labor to promulgate safety regulations, and it empowered the Occupational Safety and Health Review Commission (OSHRC) to adjudicate alleged violations. *Id.*, at 445–446. If a party violated the regulations, the agency could impose civil penalties. *Id.*, at 446.

Unlike the claims in *Granfinanciera* and this action, the OSH Act did not borrow its cause of action from the common law. Rather, it simply commanded that "[e]ach employer . . . shall comply with occupational safety and health standards promulgated under this chapter." 84 Stat. 1593, 29 U. S. C. §654(a)(2) (1976 ed.). These standards bring no common law soil with them. Cf. *Hansen*, 599 U. S., at 778. Rather than reiterate common law terms of art, they instead resembled a detailed building code. For example, the OSH Act regulations directed that a ground trench wall of "Solid Rock, Shale, or Cemented Sand and Gravels" could be constructed at a 90 degree angle to the ground. 29 CFR §1926.652, Table P–1 (1976); see *Atlas Roofing*, 430 U. S., at 447 (discussing Table P–1). But a wall of "Compacted Angular Gravels" needed to be sloped at 63 degrees, and a wall of "Well Rounded Loose Sand" at 26 degrees. §1926.652, Table P–1. The purpose of this regime was not to enable the Federal Government to bring or adjudicate

——————

[3]The dissent chides us for "leav[ing] open the possibility that *Granfinanciera* might have overruled *Atlas Roofing*." *Post*, at 25, n. 8 (opinion of SOTOMAYOR, J.). But the author of *Atlas Roofing* certainly thought that *Granfinanciera* may have done so. See *Granfinanciera*, 492 U. S., at 79 (White, J., dissenting) ("Perhaps . . . *Atlas Roofing* is no longer good law after today's decision."); see also *id.*, at 71, n. 1 (*Granfinanciera* "can be read as overruling or severely limiting" *Atlas Roofing*).

claims that traced their ancestry to the common law. Rather, Congress stated that it intended the agency to "develop[] innovative methods, techniques, and approaches for dealing with occupational safety and health problems." 29 U. S. C. §651(b)(5) (1976 ed.). In both concept and execution, the Act was self-consciously novel.

Facing enforcement actions, two employers alleged that the adjudicatory authority of the OSHRC violated the Seventh Amendment. See *Atlas Roofing*, 430 U. S., at 448–449. The Court rejected the challenge, concluding that "when Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment[]." *Id.*, at 455. As the Court explained, the case involved "a new cause of action, and remedies therefor, unknown to the common law." *Id.*, at 461. The Seventh Amendment, the Court concluded, was accordingly "no bar to . . . enforcement outside the regular courts of law." *Ibid.*

The cases that *Atlas Roofing* relied upon did not extend the public rights exception to "traditional legal claims." *Granfinanciera*, 492 U. S., at 52. Instead, they applied the exception to actions that were "'not . . . suit[s] at common law or in the nature of such . . . suit[s].'" *Atlas Roofing*, 430 U. S., at 453 (quoting *Jones & Laughlin Steel Corp.*, 301 U. S., at 48); see *Atlas Roofing*, 430 U. S., at 450–451 (discussing, *e.g.*, *Murray's Lessee*, *Ex parte Bakelite Corp.*, *Helvering* v. *Mitchell*, 303 U. S. 391 (1938), and *Oceanic Steam Navigation Co.*). Indeed, the Court recognized that if a case did involve a common law action or its equivalent, a jury was required. See 430 U. S., at 455 ("'[W]here the action involves rights and remedies recognized at common law, it must preserve to parties their right to a jury trial.'" (quoting *Pernell* v. *Southall Realty*, 416 U. S. 363, 383 (1974)); *Atlas Roofing*, 430 U. S., at 458–459 (jury required

when "courts of law supplied a cause of action and an adequate remedy to the litigant").

*Atlas Roofing* concluded that Congress could assign the OSH Act adjudications to an agency because the claims were "unknown to the common law." 430 U. S., at 461. The case therefore does not control here, where the statutory claim is "'in the nature of'" a common law suit. *Id.*, at 453 (quoting *Jones & Laughlin*, 301 U. S., at 48). As we have explained, Jarkesy and Patriot28 were prosecuted for "fraudulent conduct," App. to Pet. for Cert. 72a, and the pertinent statutory provisions derive from, and are interpreted in light of, their common law counterparts, see 15 U. S. C. §§77q(a)(2), 78j(b), 80b–6(4); 17 CFR §§240.10b–5(b), 275.206(4)–8(a)(1); *Basic Inc.*, 485 U. S., at 253 (opinion of White, J.).

The reasoning of *Atlas Roofing* cannot support any broader rule. The dissent chants "*Atlas Roofing*" like a mantra, but no matter how many times it repeats those words, it cannot give *Atlas Roofing* substance that it lacks.[4]

_____

[4] Reading the dissent, one might also think that *Atlas Roofing* is among this Court's most celebrated cases. As the concurrence shows, *Atlas Roofing* represents a departure from our legal traditions. See *post*, at 12–20 (opinion of GORSUCH, J.).

This view is also reflected in the scholarship. Commentators writing comprehensively on Article III and agency adjudication have often simply ignored the case. See, *e.g.*, R. Fallon, Of Legislative Courts, Administrative Agencies, and Article III, 101 Harv. L. Rev. 915 (1988) (no citation to *Atlas Roofing*); J. Harrison, Public Rights, Private Privileges, and Article III, 54 Ga. L. Rev. 143 (2019) (same); W. Baude, Adjudication Outside Article III, 133 Harv. L. Rev. 1511 (2020) (same).

Others who have considered it have offered nothing but a variety of criticisms. See, *e.g.*, R. Kirst, Administrative Penalties and the Civil Jury: The Supreme Court's Assault on the Seventh Amendment, 126 U. Pa. L. Rev. 1281, 1294 (1978) (through its "careless use of precedent," *Atlas Roofing* did "not recognize or [mis]understood" "careful distinctions developed by . . . earlier judges"); G. Young, Federal Courts & Federal Rights, 45 Brooklyn L. Rev. 1145, 1153 (1979) ("The *Atlas* Court . . . failed to offer an adequate justification for its interpretation of the sev-

Even as *Atlas Roofing* invoked the public rights exception, the definition it offered of the exception was circular. The exception applied, the Court said, "in cases in which 'public rights' are being litigated—*e. g.*, cases in which the Government sues in its sovereign capacity to enforce public rights created by statutes." 430 U. S., at 450; see *id.*, at 458.

After *Atlas Roofing*, this Court clarified in *Tull* that the Seventh Amendment does apply to novel statutory regimes, so long as the claims are akin to common law claims. See 481 U. S., at 421–423. In addition, we have explained that the public rights exception does not apply automatically whenever Congress assigns a matter to an agency for adjudication. See *Granfinanciera*, 492 U. S., at 52.

For its part, the dissent also seems to suggest that *Atlas Roofing* establishes that the public rights exception applies whenever a statute increases governmental efficiency. *Post*, at 15 (opinion of SOTOMAYOR, J.). Again, our precedents foreclose this argument. As *Stern* explained, effects like increasing efficiency and reducing public costs are not enough to trigger the exception. See 564 U. S., at 501; *INS* v. *Chadha*, 462 U. S. 919, 944 (1983). Otherwise, evading

––––––––––

enth amendment, either in terms of precedent or the language and history of the amendment."); M. Redish & D. La Fave, Seventh Amendment Right to Jury Trial in Non-Article III Proceedings: A Study in Dysfunctional Constitutional Theory, 4 Wm. & Mary Bill of Right J. 407, 436 (1995) (criticizing *Atlas Roofing* for failing to "provid[e] a principled basis upon which to determine the proper scope of congressional power to remove the civil jury from federal adjudications"); V. Amar, Implementing an Historical Version of the Jury in an Age of Administrative Factfinding and Sentencing Guidelines, 47 S. Tex. L. Rev. 291, 298 (2005) (questioning *Atlas Roofing* for "invert[ing] and turn[ing] on its head the *Apprendi* doctrine's central insight that juries are most important to check the power of the state" (emphasis deleted)); C. Nelson, Adjudication in the Political Branches, 107 Colum. L. Rev. 559, 604–605, and n. 189 (2007) (describing *Atlas Roofing* as "misus[ing]" precedent to "deny the novelty of its holding" and "drive a wedge" into the traditional understanding of the public-private rights distinction). We express no opinion on these various criticisms.

the Seventh Amendment would become nothing more than a game, where the Government need only identify some slight advantage to the public from agency adjudication to strip its target of the protections of the Seventh Amendment.

The novel claims in *Atlas Roofing* had never been brought in an Article III court. By contrast, law courts have dealt with fraud actions since before the founding, and Congress had authorized the SEC to bring such actions in Article III courts and still authorizes the SEC to do so today. See 3 Blackstone 41–42; §§77t, 78u, 80b–9. Given the judiciary's long history of handling fraud claims, it cannot be argued that the courts lack the capacity needed to adjudicate such actions.

In short, *Atlas Roofing* does not conflict with our conclusion. When a matter "from its nature, is the subject of a suit at the common law," Congress may not "withdraw [it] from judicial cognizance." *Murray's Lessee*, 18 How., at 284.

\*    \*    \*

A defendant facing a fraud suit has the right to be tried by a jury of his peers before a neutral adjudicator. Rather than recognize that right, the dissent would permit Congress to concentrate the roles of prosecutor, judge, and jury in the hands of the Executive Branch. That is the very opposite of the separation of powers that the Constitution demands. Jarkesy and Patriot28 are entitled to a jury trial in an Article III court. We do not reach the remaining constitutional issues and affirm the ruling of the Fifth Circuit on the Seventh Amendment ground alone.

The judgment of the Court of Appeals for the Fifth Circuit is affirmed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–859

_____

## SECURITIES AND EXCHANGE COMMISSION, PETITIONER *v.* GEORGE R. JARKESY, JR., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 27, 2024]

JUSTICE GORSUCH, with whom JUSTICE THOMAS joins, concurring.

The Court decides a single issue: Whether the Security and Exchange Commission's use of in-house hearings to seek civil penalties violates the Seventh Amendment right to a jury trial. It does. As the Court details, the government has historically litigated suits of this sort before juries, and the Seventh Amendment requires no less.

I write separately to highlight that other constitutional provisions reinforce the correctness of the Court's course. The Seventh Amendment's jury-trial right does not work alone. It operates together with Article III and the Due Process Clause of the Fifth Amendment to limit how the government may go about depriving an individual of life, liberty, or property. The Seventh Amendment guarantees the right to trial by jury. Article III entitles individuals to an independent judge who will preside over that trial. And due process promises any trial will be held in accord with time-honored principles. Taken together, all three provisions vindicate the Constitution's promise of a "fair trial in a fair tribunal." *In re Murchison*, 349 U. S. 133, 136 (1955).

## I

In March 2013, the SEC's Commissioners approved

charges against Mr. Jarkesy. The charges were serious; the agency accused him of defrauding investors. The relief the agency sought was serious, too: millions of dollars in civil penalties. See SEC, Division of Enforcement's Post-Hearing Memorandum of Law in *In re John Thomas Capital Management Group, LLC*, Admin. Proc. File No. 3–15255, pp. 28–29 (SEC, Apr. 7, 2014). For most of the SEC's 90-year existence, the Commission had to go to federal court to secure that kind of relief against someone like Mr. Jarkesy. *Ante*, at 3–4. Proceeding that way in this case hardly would have promised him an easy ride. But it would have at least guaranteed Mr. Jarkesy a jury, an independent judge, and traditional procedures designed to ensure that anyone caught up in our judicial system receives due process.

In 2010, however, all that changed. With the passage of the Dodd Frank Act, Congress gave the SEC an alternative to court proceedings. Now, the agency could funnel cases like Mr. Jarkesy's through its own "adjudicatory" system. See 124 Stat. 1376, 1862–1865. That is the route the SEC chose when it filed charges against Mr. Jarkesy.

There is little mystery why. The new law gave the SEC's Commissioners—the same officials who authorized the suit against Mr. Jarkesy—the power to preside over his case themselves and issue judgment. To be sure, the Commissioners opted, as they often do, to send Mr. Jarkesy's case in the first instance to an "administrative law judge" (ALJ). See 17 CFR §201.110 (2023). But the title "judge" in this context is not quite what it might seem. Yes, ALJs enjoy some measure of independence as a matter of regulation and statute from the lawyers who pursue charges on behalf of the agency. But they remain servants of the same master—the very agency tasked with prosecuting individuals like Mr. Jarkesy. This close relationship, as others have long recognized, can make it "extremely difficult, if not impossible, for th[e ALJ] to convey the image of being an impartial fact finder." B. Segal, The Administrative Law

Judge, 62 A. B. A. J. 1424, 1426 (1976). And with a jury out of the picture, the ALJ decides not just the law but the facts as well.[1]

Going in, then, the odds were stacked against Mr. Jarkesy. The numbers confirm as much: According to one report, during the period under study the SEC won about 90% of its contested in-house proceedings compared to 69% of its cases in court. D. Thornley & J. Blount, SEC In-House Tribunals: A Call for Reform, 62 Vill. L. Rev. 261, 286 (2017) (Thornley). Reportedly, too, one of the SEC's handful of ALJs even warned individuals during settlement discussions that he had found defendants liable in every contested case and never once "'ruled against the agency's enforcement division.'" *Axon Enterprise, Inc.* v. *FTC*, 598 U. S. 175, 213–214 (2023) (GORSUCH, J., concurring in judgment).

The shift from a court to an ALJ didn't just deprive Mr. Jarkesy of the right to an independent judge and a jury. He also lost many of the procedural protections our courts supply in cases where a person's life, liberty, or property is at stake. After an agency files a civil complaint in court, a defendant may obtain from the SEC a large swathe of documents relevant to the lawsuit. See Fed. Rule Civ. Proc. 26(b)(1). He may subpoena third parties for testimony and documents and take 10 oral depositions—more with the court's permission. Rule 45; Rule 30(a)(2)(A)(i). A court has flexibility, as well, to set deadlines for discovery and other matters to meet the needs of the case. See Rule 16. And

─────────

[1] In many agencies, litigants are not even entitled to have ALJs, with their modicum of protections, decide their cases. These agencies use "administrative judges." Some agencies can replace these administrative judges if they don't like their decisions. And some of these judges may move in and out of prosecutorial and adjudicatory roles, or move in and out of the very industries their agencies regulate. See *United States* v. *Arthrex, Inc.*, 594 U. S. 1, 36–37 (2021) (GORSUCH, J., concurring in part and dissenting in part).

come trial, the Federal Rules of Evidence apply, meaning that hearsay is generally inadmissible and witnesses must usually testify in person, subject to cross-examination. See Fed. Rule Evid. 802.

Things look very different in agency proceedings. The SEC has a responsibility to provide "documents that contain material exculpatory evidence." 17 CFR §201.230(b)(3). But the defendant enjoys no general right to discovery. Though ALJs enjoy the power to issue subpoenas on the request of litigants like Mr. Jarkesy, §201.232(a), they "often decline to issue [them] or choose to significantly narrow their scope," G. Mark, SEC and CFTC Administrative Proceedings, 19 U. Pa. J. Const. L. 45, 68 (2016). Oral depositions are capped at five, with another two if the ALJ grants permission. §201.233(a). In some cases, an administrative trial must take place as soon as 1 month after service of the charges, and that hearing must follow within 10 months in even the most complex matters. §201.360(a)(2)(ii). The rules of evidence, including their prohibition against hearsay, do not apply with the same rigor they do in court. §201.235(a)(5); see §201.230. For that reason, live testimony often gives way to "investigative testimony"—that is, a "sworn statement" taken outside the presence of the defendant or his counsel. §201.235(b).

How did all this play out in Mr. Jarkesy's case? Accompanying its charges, the SEC disclosed 700 gigabytes of data—equivalent to between 15 and 25 million pages of information—it had collected during its investigation. App. to Pet. for Cert. 164a; Complaint in *Jarkesy* v. *U. S. SEC*, No. 1:14–cv–00114 (DDC, Jan. 29, 2014), ECF Doc. 1, ¶49, pp. 12–13. Over Mr. Jarkesy's protest that it would take "two lawyers or paralegals working twelve-hour days over four decades to review," *ibid.*, the ALJ gave Mr. Jarkesy 10 months to prepare for his hearing, see App. to Pet. for Cert. 156a. Then, after conducting that hearing, the ALJ turned around and obtained from the Commission "an extension of

six months to file [her] initial decision." *In re John Thomas Capital Management Group LLC*, SEC Release No. 9631, p. 1 (Aug. 13, 2014). The reason? The "'size and complexity of the proceeding.'" *Id.*, at 2. When that decision eventually arrived seven months after the hearing, the ALJ agreed with the SEC on every charge. See App. to Pet. for Cert. 155a–156a, 212a.

Mr. Jarkesy had the right to appeal to the Commission, but appeals to that politically accountable body (again, the same body that approved the charges) tend to go about as one might expect. The Commission may decline to review the ALJ's decision. §201.411(b)(2). If it chooses to hear the case, it may *increase* the penalty imposed on the defendant. Thornley 286. A defendant unhappy with the result can seek further review in court, though that process will take more time and money, too. Nor will he find a jury there, only a judge who must follow the agency's findings if they are supported by "'more than a mere scintilla'" of evidence. *Biestek* v. *Berryhill*, 587 U. S. 97, 103 (2019).

Mr. Jarkesy filed an appeal anyway. The Commission agreed to review the ALJ's decision. It then afforded itself the better part of six years to issue an opinion. And, after all that, it largely agreed with the ALJ. See App. to Pet. for Cert. 71a–74a. None of this likely came as a surprise to the SEC employees in the Division of Enforcement responsible for pressing the action against Mr. Jarkesy. While his appeal was pending, employees in that division—including an "'Enforcement Supervisor'" in the regional office prosecuting Mr. Jarkesy—accessed confidential memos by the Commissioners' advisors about his appeal. See SEC, Second Commission Statement Relating to Certain Administrative Adjudications 3 (June 2, 2023).

## II

## A

If administrative proceedings like Mr. Jarkesy's seem a

thoroughly modern development, the British government
and its agents engaged in a strikingly similar strategy in
colonial America.  Colonial administrators routinely
steered enforcement actions out of local courts and into
vice-admiralty tribunals where they thought they would
win more often.  These tribunals lacked juries.  They lacked
truly independent judges.  And the procedures materially
differed from those available in everyday common-law
courts.

The vice-admiralty courts in the Colonies began as rough
equivalents of English courts of admiralty.  E. Surrency,
The Courts in the American Colonies, 11 Am. J. Legal Hist.
347, 355 (1967).  These courts generally concerned them-
selves with maritime matters arising on "the oceans and
rivers and their immediate shores."  C. Ubbelohde, The
Vice-Admiralty Courts and the American Revolution 19
(1960) (Ubbelohde).  And the proceedings they used ac-
corded more with civil law traditions than common law
ones.  Among other things, this meant officials could try
cases against colonists without a jury.  *Id.*, at 21.

Confined to admiralty disputes, perhaps the lack of a jury
would have proven unexceptional (as juries were not usu-
ally required in such cases then, nor are they today).  See,
*e.g.*, *Lewis* v. *Lewis & Clark Marine, Inc.*, 531 U. S. 438, 448
(2001).  But Parliament deployed these juryless tribunals
in the Colonies to new ends that, according to John Adams,
could fill "'volumes.'"  Ubbelohde vii.  The creep away from
the original province of those courts began with the grant
of authority over violations of certain trade and customs
laws.  But in the decade before the Revolution, the drip,
drip, drip of expanding power became a torrent, as Parlia-
ment allowed more and more actions to be brought in colo-
nial vice-admiralty courts.

Many of the matters added to vice-admiralty jurisdiction
in the Colonies would have required juries in England.  *Id.*,
at 112.  But as the Massachusetts royal governor explained,

colonial juries "'were not to be trusted.'"  D. Lovejoy, Rights Imply Equality:  The Case Against Admiralty Jurisdiction in America, 1764–1776, 16 Wm. & Mary Q. 459, 468 (1959). Even violations that did not implicate the jury right normally would have been heard in England "before a court in [one's] own neighborhood or county where [one] could count on traditional common-law procedure."  *Id.*, at 471.  But by expanding the reach of vice-admiralty jurisdiction in the Colonies, Parliament denied similar protections to Americans.  See *Erlinger* v. *United States*, 602 U. S. ___, ___ (2024) (slip op., at 5).

Vice-admiralty court judges also lacked independence. While judges in England since the end of the seventeenth century generally enjoyed the protection of tenure during good behavior, colonial judges usually served at the pleasure of the royal administration.  See *United States* v. *Will*, 449 U. S. 200, 218–219 (1980).  And, doing away with the pretense of impartiality entirely, some vice-admiralty judges held dual appointments—for instance, as colonial attorneys general and vice-admiralty judges.  Ubbelohde 162–163.

Like the modern SEC, British colonial officials were not *required* to bring many of their cases before the vice-admiralty courts.  Often, Parliament gave those officials the option to proceed in either the ordinary common-law courts or the vice-admiralty courts.  Unsurprisingly, though, they sought to file where they were most likely to win.  And "[i]n this contest, the vice-admiralty courts were usually the victors."  *Id.*, at 21.

### B

The abuses of these courts featured prominently in the calls for revolution.  In the First Continental Congress, the assembled delegates condemned how Parliament "extend[ed] the jurisdiction of Courts of Admiralty," complained how colonial judges were "dependent on the

Crown," and demanded the right to the "common law of
England" and the "great and inestimable privilege" of a jury
trial. Declaration and Resolves of the First Continental
Congress, Oct. 14, 1774, in 1 Journals of the Continental
Congress, 1774–1789, pp. 68–69 (W. Ford 1904 ed.). Two
years later, the drafters of the Declaration of Independence
repeated these concerns, admonishing the King for
"ma[king] Judges dependent on his Will alone," ¶11, and
"[f]or depriving [the colonists] in many cases, of the benefits
of Trial by Jury," ¶20. By that point, however, the "musket
fire at Lexington and Concord . . . signaled the end not only
of the vice-admiralty courts, but of all British rule in Amer-
ica." Ubbelohde 190.

When the smoke settled, the American people went to
great lengths to prevent a backslide toward anything like
the vice-admiralty courts. *Erlinger*, 602 U. S., at ___–___
(slip op., at 5–6). One product of these efforts was Article
III of the Constitution. There, the Constitution provided
that "[t]he judicial Power"—the power over "Cases" and
"Controversies"—would lie with life-tenured, salary-protected
judges. §§1–2; see *Oil States Energy Services, LLC* v.
*Greene's Energy Group, LLC*, 584 U. S. 325, 346 (2018)
(GORSUCH, J., dissenting). As the Court has recognized,
this meant the Executive Branch could "exercise no part of
th[e] judicial power." *Murray's Lessee* v. *Hoboken Land &
Improvement Co.*, 18 How. 272, 275 (1856), "no matter how
court-like [its] decisionmaking process might appear," *Ortiz*
v. *United States*, 585 U. S. 427, 465 (2018) (ALITO, J., dis-
senting). Nor could Congress "withdraw from judicial cog-
nizance any matter which, from its nature, is the subject of
a suit at the common law, or in equity, or admiralty"—the
traditional scope of the "judicial Power." *Murray's Lessee*,
18 How., at 284; see Art. III, §2.

Despite these guarantees, many at the founding thought
Article III didn't go far enough. Yes, it promised a defend-
ant an independent judge rather than one dependent on

those who hold political power.  But what would stop Congress from requiring litigants to navigate vice-admiralty's alien procedures in *all* federal cases?  Or from making "federal processes" even *more* byzantine, so "as to [effectively] destroy [individual] rights?"  Letter from a Federal Farmer (Jan. 20, 1788), in 2 The Complete Anti-Federalist 328 (H. Storing ed. 1981).

And what about civil juries?  "[T]he jury trial," one prominent Anti-Federalist observed, "brings with it an open and public discussion of all causes, and excludes secret and arbitrary proceedings."  Letter from a Federal Farmer (Jan. 18, 1788), in *id.*, at 320 (Federal Farmer 15).  The participation of ordinary Americans "drawn from the body of the people" serves another function, too:  "If the conduct of judges shall . . . tend to subvert the laws, and change the forms of government, the jury may check them."  *Ibid.*  As originally composed, however, the Constitution promised a trial by jury for "all Crimes," but said nothing about civil cases.  Art III, §2, cl. 3.  Some wondered, did this mean judges, not juries, would be "left masters as to facts" in civil disputes?  Federal Farmer 15, at 322.  If so, asked another, "what satisfaction can we expect from a lordly court of justice, always ready to protect the officers of government against the weak and helpless citizen"?  Essay of a Democratic Federalist (Oct. 17, 1787), in 3 Complete Anti-Federalist 61.

The answer to these concerns was the Bill of Rights.  *Erlinger*, 602 U. S., at ___ (slip op., at 6).  As the Court details, the Seventh Amendment promised the right to a jury trial in "'[s]uits at common law.'"  *Ante*, at 8 (quoting Amdt. 7).  But because the Constitution was designed to "endure for ages to come," *McCulloch* v. *Maryland*, 4 Wheat. 316, 415 (1819), this did not mean only those "suits, which the common law recognized among its old and settled proceedings," *Parsons* v. *Bedford*, 3 Pet. 433, 447 (1830).  The founding

generation anticipated the possibility Congress would in-
troduce new causes of action and perhaps new remedies,
too. See *ibid.* Accordingly, this Court has long understood
the Seventh Amendment's protections to apply in "all [civil]
suits which are not of equity [or] admiralty jurisdiction."
*Ibid.*; accord, *ante*, at 8–9. In this way, the Seventh Amend-
ment seeks to ensure there will be no juryless vice-admiralty
courts in the United States.

  The Fifth Amendment's Due Process Clause addressed
remaining concerns about the processes that would attend
trials before independent judges and juries. It provided
that the government may not deprive anyone of "life, lib-
erty, or property, without due process of law." As originally
understood, this provision prohibited the government from
"depriv[ing] a person of those rights without affording him
the benefit of (at least) those customary procedures to
which freemen were entitled by the old law of England."
*Sessions* v. *Dimaya*, 584 U. S. 148, 176 (2018) (GORSUCH, J.,
concurring in part and concurring in judgment) (internal
quotation marks omitted); see *Erlinger*, 602 U. S., at ___–
___ (slip op., at 6–7).

  More than that, because it was "the peculiar province of
the judiciary" to safeguard life, liberty, and property, due
process often meant *judicial* process. 1 St. George Tucker,
Blackstone's Commentaries, Editor's App. 358 (1803). That
is, if the government sought to interfere with those rights,
nothing less than "the process and proceedings of the com-
mon law" had to be observed before any such deprivation
could take place. 3 J. Story, Commentaries on the Consti-
tution of the United States §1783, p. 661 (1833) (Story). In
other words, "'due process of law' generally implie[d] and
include[d] . . . *judex* [a judge], regular allegations, oppor-
tunity to answer, and a trial according to some settled
course of judicial proceedings." *Murray's Lessee*, 18 How.,
at 280. This constitutional baseline was designed to serve

as "a restraint on the legislative" branch, preventing Congress from "mak[ing] any process 'due process of law,' by its mere will." *Id.*, at 276.

C

These three constitutional provisions were meant to work together, and together they make quick work of this case. In fact, each provision requires the result the Court reaches today.

*First*, because the "'matter'" before us is one "which, from its nature, is the subject of a suit at the common law," *id.*, at 284, "the responsibility for deciding [it] rests with Article III judges in Article III courts." *Stern* v. *Marshall*, 564 U. S. 462, 484 (2011). Nor does it make a difference whether we think of the SEC's action here as a civil-penalties suit or something akin to a traditional fraud claim: At the founding, both kinds of actions were tried in common-law courts. See *ante*, at 9–13 (discussing civil penalties); see also, *e.g.*, *Pasley* v. *Freeman*, 3 T. R. 51, 100 Eng. Rep. 450 (K. B. 1789) (action for fraud); *Baily* v. *Merrell*, 3 Bulst. 94, 81 Eng. Rep. 81 (K. B. 1615) (same). And that tells us all we need to know that the SEC's in-house civil-penalty scheme violates Article III by "withdraw[ing]" the matter "from judicial cognizance" and handing it over to the Executive Branch for an in-house trial. *Murray's Lessee*, 18 How., at 284; see *supra*, at 7–8.

*Second*, because the action the SEC seeks to pursue is not the stuff of equity or admiralty jurisdiction but the sort of suit historically adjudicated before common-law courts, the Seventh Amendment guarantees Mr. Jarkesy the right to have his case decided by a jury of his peers. In this regard, it is irrelevant that the SEC derived its power to sue under a "new statut[e]" or that the agency proceeded under "a new cause of action." Brief for Petitioner 13, 22 (internal quotation marks omitted). As we have seen, the government cannot evade the Seventh Amendment so easily. See *ante*, at

9; *supra*, at 8–10.

*Third*, were there any doubt, the Due Process Clause confirms these conclusions.  Cf. *Murray's Lessee*, 18 How., at 275 (explaining that the Article III challenge before the Court could "best be considered" as raising a due process question).  Because the penalty the SEC seeks would "depriv[e]" Mr. Jarkesy of "property," Amdt. 5, due process demands nothing less than "the process and proceedings of the common law," 3 Story §1783, at 661.  That means the regular course of trial proceedings with their usual protections, see *Murray's Lessee*, 18 How., at 280, not the use of ad hoc adjudication procedures before the same agency responsible for prosecuting the law, subject only to hands-off judicial review, see *supra*, at 10–11.

## III

### A

The government resists these conclusions.  As the government sees it, this case implicates the so-called public rights exception.  One that defeats not only Mr. Jarkesy's right to trial by jury, but also his right to proceed before an independent trial judge consistent with traditional judicial processes.  That is, on the government's account, not only does the Seventh Amendment fall away; so does the usual operation of Article III and the Due Process Clause.

In the government's view, the public rights exception "*at a minimum* allows Congress to create new statutory obligations, impose civil penalties for their violation, and then commit to an administrative agency the function of deciding whether a violation has in fact occurred."  Brief for Petitioner 21 (emphasis added; internal quotation marks omitted).  Put plainly, all that need be done to dispense almost entirely with three separate constitutional provisions is an Act of Congress creating some new statutory obligation.  And, the government continues, this case easily meets that standard because the proceeding against Mr. Jarkesy is one

"brought by the government against a private party" under a statute designed "to remedy harm to the public at large." *Id*., at 24 (internal quotation marks omitted).

The Court rightly rejects these arguments. See *ante*, at 19–21. No one denies that, under the public rights exception, Congress may allow the Executive Branch to resolve certain matters free from judicial involvement in the first instance. *Ante*, at 6, 14–15. But, despite its misleading name, the exception does not refer to *all* matters brought by the government against an individual to remedy public harms, or even all those that spring from a statute. See *ante*, at 16–17. Instead, public rights are a narrow class defined and limited by history. As the Court explains, that class has traditionally included the collection of revenue, customs enforcement, immigration, and the grant of public benefits. *Ante*, at 15–17.

How did these matters find themselves categorized as public rights? Competing explanations abound. Some have pointed to ancient practical considerations. In *Murray's Lessee*, for example, the Court reasoned that the "[i]mperative necessity" of tax collection for a functional state had long caused governments to treat "claims for public taxes" differently from "all others." 18 How., at 282. Others have theorized that "the core of the judicial power" concerns the disposition of the "three 'absolute' rights" "to life, liberty, and property." *Wellness Int'l Network, Ltd.* v. *Sharif*, 575 U. S. 665, 713–714 (2015) (THOMAS, J., dissenting). Public rights, the theory goes, involve matters originally understood to fall outside this core. *Id*., at 714. So, for example, "[a]lthough Congress could authorize executive agencies to dispose of *public* rights in land—often by means of adjudicating a claimant's qualifications for a land grant under a statute—the United States had to go to the courts if it wished to revoke" that grant, which had become the owner's private property. *Id*., at 715. There are still other theories yet. See, *e.g.*, *Stern*, 564 U. S., at 489.

Whatever their roots, traditionally recognized public rights have at least one feature in common: a serious and unbroken historical pedigree. See *Culley* v. *Marshall*, 601 U. S. 377, 397–398 (2024) (GORSUCH, J., concurring); *ante*, at 14–17. For good reason. If the Article III "judicial Power" encompasses "the stuff of the traditional actions at common law tried by the courts of Westminster in 1789," *ante*, at 14 (internal quotation marks omitted), it follows that matters traditionally adjudicated outside those courts might *not* fall within Article III's ambit. See *Stern*, 564 U. S., at 504–505 (Scalia, J., concurring) ("[A]n Article III judge is required in *all* federal adjudications, unless there is a firmly established historical practice to the contrary"). So too with the Due Process Clause. If that clause sets customary common-law practice as the ordinary procedural baseline, see Part II–B, *supra*, clear historical evidence of a different practice might warrant a departure from that baseline, see *Murray's Lessee*, 18 How., at 280. That's why this Court has said "'a process of law . . . must be taken to be due process of law' if it enjoys 'the sanction of settled usage both in England and in this country.'" *Culley*, 601 U. S., at 397 (GORSUCH, J., concurring) (quoting *Hurtado* v. *California*, 110 U. S. 516, 528 (1884)).

With the public rights exception viewed in this light, the government's invocation of it in this case cannot succeed. Starting with a "'presumption . . . in favor of Article III courts'" and their usual attendant processes, *ante*, at 18, we look for some "deeply rooted" tradition of nonjudicial adjudication before permitting a case to be tried in a different forum under different procedures, *Culley*, 601 U. S., at 397 (GORSUCH, J., concurring). We have upheld summary procedures for customs collection, for example, because they were consistent with both "the common and statute law of England prior to the emigration of our ancestors" and "the laws of many of the States at the time of the adoption of" the Constitution. *Murray's Lessee*, 18 How., at 280; see

*ante*, at 14–15. But when it comes to the kind of civil-penalty suit before us, that same history points in the opposite direction, suggesting actions of this sort belong before an independent judge, a jury, and decided in a trial that accords with traditional judicial procedures. *Ante*, at 9–13; *supra*, at 11–12. Just as SEC practices themselves largely reflected as recently as 2010.

### B

If all that's so, why might the government feel comfortable invoking the public rights exception? To be fair, much of it may have to do with this Court. Some of our past decisions have allowed the government to chip away at the courts' historically exclusive role in adjudicating private rights—and juries' accompanying role in that adjudication. This process began, of all places, in an admiralty case.

In *Crowell* v. *Benson*, 285 U. S. 22 (1932), this Court faced a constitutional challenge to the Longshoremen's and Harbor Workers' Compensation Act of 1927. The Act directed employers to compensate employees for injuries occurring at sea. 44 Stat. 1426. The law further assigned primary responsibility for deciding liability disputes to an Executive Branch official, the deputy commissioner of the United States Employees' Compensation Commission. *Id.*, at 1435–1437; *Crowell*, 285 U. S., at 42–43. The Court acknowledged that this regime empowered the deputy commissioner to decide in the first instance the monetary "liability of one individual to another." *Id.*, at 51. The Court recognized that this amounted to a classic "private right" suit of the kind traditionally tried in court. *Ibid.* The Court even conceded that, under the law, the factual "findings of the deputy commissioner, supported by evidence and within the scope of his authority, shall be final": An Article III court could not review the facts anew. *Id.*, at 46. But the Court upheld the scheme and its limited judicial review anyway.

To get there took a dash of fiction and a pinch of surmise. From time to time, the Court observed, judges appoint their own special "masters and commissioners" to prepare reports on fact issues or damages. *Id.*, at 51. These reports are nonbinding and "essentially . . . advisory." *Ibid.* Judges themselves remain the decisionmakers. In *Crowell*, the Court embraced the fiction that Executive Branch officials might similarly act as assistants or adjuncts to Article III courts. And because judges often adopt the proposed findings of their masters and commissioners, the Court surmised, Article III posed no bar to Congress taking a further step and *requiring* judges to treat the findings of Executive Branch officials as essentially "final." *Id.*, at 46. "To hold otherwise," the Court reasoned, "would be to defeat the obvious purpose of the legislation": "to furnish a prompt, continuous, expert, and inexpensive method for dealing with a class of questions of fact which are peculiarly suited to examination and determination by an administrative agency specially assigned to that task." *Ibid.*

*Crowell* itself only went so far, however. The case fell within federal courts' admiralty jurisdiction, and tribunals sitting in admiralty in England and America alike had long heard certain matters falling within the public rights exception. See *Culley*, 601 U. S., at 398 (GORSUCH, J., concurring). In deciding those matters, courts had long tolerated some flexibility in procedures, had long restricted appellate review of factual findings, and had always proceeded without a jury. *Crowell*, 285 U. S., at 45, 53.

Soon, though, none of that mattered. Almost in a blink, the admiralty limitation was discarded, and more and more agencies began assuming adjudicatory functions previously reserved for judges and juries, employing novel procedures that sometimes bore faint resemblance to those observed in court. Along the way, prominent voices in and out of government expressed concern at this development. Consider just two typical examples. Were an agency endowed with

the power to assess civil penalties, advised a committee overseen by Attorney General (soon-to-be Justice) Robert H. Jackson, "the aggrieved person" should at least "be permitted review de novo by a Federal district court." Final Report of Attorney General's Committee on Administrative Procedure 147 (1941). That was the only way, the committee opined, "to resolve any doubts concerning the constitutionality of the procedure." *Ibid.* Around the same time, a committee of the American Bar Association led by Roscoe Pound sounded a similar alarm. Administrative agencies, the committee warned, had a "tendency to mix up rule making, investigation, prosecution, the advocate's function, the judge's function, and the function of enforcing the judgment, so that the whole proceeding from end to end is one to give effect to a complaint." Report of the Special Committee on Administrative Law, 63 Ann. Rep. 331, 351 (1938).

The high-water mark of the movement toward agency adjudication may have come in 1977 in *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n*, 430 U. S. 442. Some have read that decision to suggest the category of public rights might encompass pretty much any case arising under any "'new statutory obligations,'" Brief for Petitioner 22 (quoting *Atlas Roofing*, 430 U. S., at 450). It is a view the government essentially espouses in this case. But without reference to any constitutional text or history to guide what does or does not qualify as a public right, that view has (unsurprisingly) proven wholly unworkable.

It did not take long for this Court to realize as much. Just 12 years later, in *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33 (1989), this Court cabined *Atlas Roofing* so narrowly that the author of *Atlas Roofing* complained that the Court had "overrul[ed]" it. 492 U. S., at 71, n. 1 (White, J., dissenting); see *ante*, at 23, n. 3. Far from endorsing the notion that any new statutory obligation could qualify for

treatment as a public right, for example, the Court in *Gran-financiera* read *Atlas Roofing* as having "left the term 'public rights' undefined." 492 U. S., at 51, n. 8. And since then this Court has, in one case after another, "adhere[d]" only to *Atlas Roofing's* "general teaching" that Congress may constitutionally adopt "new statut[es]" assigning matters that indeed qualify as "public rights . . . to an administrative agency." 492 U. S., at 51 (internal quotation marks omitted); see, *e.g.*, *Stern*, 564 U. S., at 489–490; *Oil States*, 584 U. S., at 345.

Yet, even after the Court moved away from *Atlas Roofing*, our public rights jurisprudence remained muddled. Since then, the Court has suggested that public rights might include those "involving statutory rights that are integral parts of a public regulatory scheme." *Granfinanciera*, 492 U. S., at 55, n. 10. We have changed course and tried our hand at a five-factor balancing test. See *Stern*, 564 U. S., at 491 (describing *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833 (1986)). We have replaced that test with one that considers "at least seven different" factors. 564 U. S., at 504 (Scalia, J., concurring). And at one time or another, these factors have included the consideration of "the concerns that drove Congress to depart from the requirements of Article III." *Schor*, 478 U. S., at 851. So, for example, we have asked whether insistence on "the institutional integrity of the Judicial Branch" would "unduly constrict Congress' ability to take needed and innovative action pursuant to its Article I powers." *Ibid.*

Today, the Court does much to return us to a more traditional understanding of public rights. Adhering to *Granfinancieria*, the Court rejects the government's overbroad reading of *Atlas Roofing* and recognizes that the kind of atextual and ahistorical (not to mention confusing) tests it inspired do little more than ask policy questions the Constitution settled long ago. Yes, a limited category of public rights were originally and even long before understood to

be susceptible to resolution without a court, jury, or the other usual protections an Article III court affords. But outside of those limited areas, we have no license to deprive the American people of their constitutional right to an independent judge, to a jury of their peers, or to the procedural protections at trial that due process normally demands. Let alone do so whenever the government wishes to dispense with them.

This Court does not subject other constitutional rights to such shabby treatment. We have "reaffirm[ed]," many times and "emphatically[,] that the First Amendment does not permit the State to sacrifice speech for efficiency." *Riley* v. *National Federation of Blind of N. C., Inc.*, 487 U. S. 781, 795 (1988). We have rejected a framework for Second Amendment challenges that would balance the right to bear arms against "'other important governmental interests.'" *District of Columbia* v. *Heller*, 554 U. S. 570, 634 (2008). It is hornbook Fourth Amendment law that "[a] generalized interest in expedient law enforcement cannot, without more, justify a warrantless search." *Georgia* v. *Randolph*, 547 U. S. 103, 115, n. 5 (2006). And even though the Sixth Amendment's guarantee of a jury trial in criminal cases may have "'its weaknesses and the potential for misuse,'" *Duncan* v. *Louisiana*, 391 U. S. 145, 156 (1968), we continue to insist that it "be jealously preserved," *Patton* v. *United States*, 281 U. S. 276, 312 (1930); see *Ramos* v. *Louisiana*, 590 U. S. 83, 110–111 (2020) (plurality opinion); *Erlinger*, 602 U. S., at ___ (slip op., at 18) ("There is no efficiency exception to the . . . Sixth Amendmen[t]").

Why should Article III, the Seventh Amendment, or the Fifth Amendment's promise of due process be any different? None of them exists to "protec[t] judicial authority for its own sake." *Oil States*, 584 U. S., at 356 (GORSUCH, J., dissenting). They exist to "protect the individual." *Bond* v. *United States*, 564 U. S. 211, 222 (2011). And their protec-

tions are no less vital than those afforded by other constitutional provisions. As American colonists learned under British rule, "the right of trial" means little "when the actual administration of justice is dependent upon caprice, or favour, [or] the will of rulers." 3 Story §1568, at 426; *id.*, §1783, at 661. In recognizing as much today, the Court essentially follows the advice of Justices Brennan and Marshall, "limit[ing] the judicial authority of non-Article III federal tribunals to th[o]se few, long-established exceptions" that bear the sanction of history, and "countenanc[ing] no further erosion." *Schor*, 478 U. S., at 859 (Brennan, J., joined by Marshall, J., dissenting).

### C

The dissent's competing account of public rights is astonishing. On its telling, the Constitution might impose some (undescribed) limits on the power of the government to send cases "involving the liability of one individual to another" to executive tribunals for resolution. *Post*, at 22 (opinion of SOTOMAYOR, J.). But, thanks to public rights doctrine, the dissent insists, the Constitution imposes *no* limits on the government's power to seek civil penalties "outside the regular courts of law where there are no juries." *Post*, at 2. In that field, the Constitution falls silent. The dissent does not even attempt to deploy any of the contrived balancing tests that emerged in *Atlas Roofing*'s aftermath to rein in the government's power. But where in Article III, the Seventh Amendment, and due process can the dissent find this new rule? What about founding-era practice or original meaning? And why would a Constitution drawn up to protect against arbitrary government action make it easier for the government than for private parties to escape its dictates? The dissent offers no answers.

To be sure, the dissent tries to appeal to precedent. It even asserts that our decisions support, "*without exception*," its sweeping conception of public rights doctrine. *Post*, at

12 (emphasis added). But the dissent's approach to our precedents is like a picky child at the dinner table. It selects only a small handful while leaving much else untouched. To start, the dissent lingers briefly on *Murray's Lessee*—but not long enough to explain the opinion's conception of Article III, due process, or the extended historical inquiry that led the Court to conclude the collection of revenue concerned a public right. See *post*, at 9–10; *supra*, at 8, 10–14.

The 19th century behind it (for it does not trouble with the founding era), the dissent turns to *Oceanic Steam Nav. Co.* v. *Stranahan*, 214 U. S. 320 (1909). Drawing on that decision, the dissent contends that "Congress [has] routinely 'impose[d] appropriate obligations'" by statute and given "'executive officers the power to enforce'" them "'without the necessity of invoking the judicial power.'" *Post*, at 11 (quoting *Stranahan*, 214 U. S., at 339). Notably absent from the dissent's account, however, is the decision's discussion of Congress's long-recognized and extensive authority over the field of immigration, the area of law at issue there. See *id.*, at 339. Unmentioned, too, is *Stranahan*'s explanation that what links immigration to other public rights like "tariff[s], . . . internal revenue, taxation," and "foreign commerce" is that, "'from the beginning[,] Congress has exercised a plenary power'" over them "because they all relate to subjects peculiarly within the authority of the legislative department." *Id.*, at 334, 339.

Really, one has to wonder: If the public rights exception is as broad and unqualified as the dissent asserts, why did our predecessors bother to discuss history or Congress's peculiar powers when it comes to revenue and immigration? Why didn't the Court simply announce the rule the dissent would have us announce today: that our Constitution does not stand in the way of "agency adjudications of statutory claims . . . brought by the Government in its sovereign ca-

pacity"? *Post*, at 4. The answer, of course, is that the Con-
stitution has never countenanced the dissent's notion that
the Executive is free to reassign virtually any civil case in
which it is a party to its own tribunals where its own em-
ployees decide cases and inconvenient juries and traditional
trial procedures go by the boards.

That my dissenting colleagues plow ahead anyway with
their remarkable conception of public rights is all the more
puzzling considering how regularly they have argued
*against* that sort of sweeping concentration of governmen-
tal power. The dissenters have recognized that a "lack of
standardized procedural safeguards" can leave government
enforcement schemes "vulnerable to abuse" and individuals
subject to coercive "pressure from unchecked prosecutors."
*Culley*, 601 U. S., at 405, 407 (SOTOMAYOR, J., joined by
KAGAN and JACKSON, JJ., dissenting). They have con-
tended that the Judiciary has an affirmative obligation to
supply "meaningful remedies," trials before judges and ju-
ries included, even when "Congress or the Executive has
[already] created a remedial process." *Egbert* v. *Boule*, 596
U. S. 482, 524–525 (2022) (SOTOMAYOR, J., joined by, *inter
alios*, KAGAN, J., dissenting) (internal quotation marks
omitted; emphasis deleted). And like most every current
Member of this Court at one time or another, they have
acknowledged that the jury-trial right "stands as one of the
Constitution's most vital protections against arbitrary gov-
ernment." *United States* v. *Haymond*, 588 U. S. 634, 637
(2019) (plurality opinion).

The dissent's conception of public rights is so unqualified
that it refuses to commit itself on the question whether even
muted forms of judicial review—such as asking executive
tribunals to muster "more than a mere scintilla" of evidence
in support of their rulings—are constitutionally required in
the essentially unbounded class of cases that fall within its
conception of public rights. See Part I, *supra*; *post*, at 8,
n. 4. Gone, too, is any role for the jury—for why would the

government ever go to court if it may more readily secure a
win before its own employees?  The only attempt to mitigate
the havoc its rule would wreak comes when the dissent de-
clares that "'[t]he public-rights doctrine does not extend to
. . . criminal matters.'"  *Post*, at 27, n. 9.  But the dissent
does not (and cannot) explain how that fits with all else it
says.  If, as the dissent insists, a public right is any "new
right" that "belongs to the public and inheres in the Gov-
ernment in its sovereign capacity," *post*, at 28, what could
possibly better fit the description than the enforcement of
new criminal laws?  See *Shinn* v. *Martinez Ramirez*, 596
U. S. 366, 376 (2022) ("The power to convict and punish
criminals lies at the heart of the States' residuary and invi-
olable sovereignty" (internal quotation marks omitted)).[2]

  All but admitting its view has no support in "historical
practice dating back to the founding," the dissent chastises
the Court for daring to rely on that practice to flesh out the
scope of the public rights exception.  *Post*, at 18.  It would
be so much simpler, the dissent says, to adopt its rule per-
mitting the government to skirt oversight by judge and jury
alike whenever it enacts a new law.  And, true enough, "a
principle that the government always wins surely would be
simple for judges to implement."  *United States* v. *Rahimi*,
602 U. S. ___, ___ (2024) (GORSUCH, J., concurring) (slip op.,
at 6).  But looking to original meaning and historical prac-
tice informing it is exactly how this Court proceeds in so

_____

  [2]The best the dissent can do is to observe that "Article III itself pre-
scribes that '[t]he trial of all Crimes . . . shall be by Jury.'"  *Post*, at 27,
n. 9 (quoting §2, cl. 3).  That response might be reassuring if the dissent's
treatment of the Seventh Amendment didn't supply a roadmap for work-
ing around it.  On the dissent's telling, the Seventh Amendment can be
dispensed with at will:  It applies "only in judicial proceedings," and not
whenever the government chooses to assign a matter to its own in-house
tribunals.  *Post*, at 5.  And under that logic, there is no apparent reason
why the government could not evade Article III's jury-trial right just as
easily, simply by choosing to route criminal prosecutions through execu-
tive agencies.

many other contexts where we seek to honor the Constitution's demands—including, notably, when we seek to ascertain the scope of the *criminal* jury-trial right and the defendant's attendant right to confront his accusers.  See *Erlinger*, 602 U. S., at ___–___ (slip op., at 19–20); *Crawford* v. *Washington*, 541 U. S. 36, 50 (2004).  What's more, this approach has the virtue of "keep[ing] judges in their proper lane" by "seeking to honor the supreme law the people have ordained rather than substituting our will for theirs." *Rahimi*, 602 U. S., at ___–___ (GORSUCH, J., concurring) (slip op., at 4–5); see *Crawford*, 541 U. S., at 67.

It is hard, as well, to take seriously the dissent's charges of unworkability and unpredictability.  At least until today, the dissenters supported procedural protections for those in the government's sights in civil as well as criminal cases. What kind of protections?  Often, they have argued, it depends on a judicial balancing test.  One that is "flexible," defies "technical conception," lacks "fixed content," and will "not always yield the same result" even when applied in similar circumstances.  *Culley*, 601 U. S., at 413 (opinion of SOTOMAYOR, J.) (internal quotation marks omitted).  As we have seen, that was essentially the course some pursued, too, when it came to the public rights exception in the fallout from *Atlas Roofing*.  See Part III–B, *supra*.  But that kind of "'we know it when we see it'" approach to constitutional rights, *post*, at 21, can hardly claim any serious advantages when it comes to workability or predictability.

Failing all else, the dissent retreats to *Atlas Roofing*.  At least that decision, it insists, supports its nearly boundless conception of public rights.  The dissent goes so far as to accuse the Court of undermining "*stare decisis* and the rule of law," *post*, at 15, and engaging in "a power grab," *post*, at 37, by failing to give *Atlas Roofing* its broadest possible construction.  It's a "disconcerting" accusation indeed, *post*, at 36, and a misdirected one at that.  Construed as broadly as the dissent proposes, *Atlas Roofing*'s view of public rights

stands as an outlier in our jurisprudence—with no apparent support in original meaning, at odds with prior precedent, and inconsistent with later precedent as well. See *ante*, at 25, n. 4; Part III–B, *supra*. Meanwhile, the Court's alternative construction of *Altas Roofing* fits far more comfortably with all those legal sources. In that respect, the majority's approach is of a piece with *Granfinanciera*'s similar approach 25 years ago. And, more broadly, it is of a piece with our usual practice of construing "loose language" found in a prior judicial opinion in a way that better conforms it to the mainstream of our precedents. *Groff* v. *DeJoy*, 600 U. S. 447, 474 (2023) (SOTOMAYOR, J., concurring). As the dissenters have previously acknowledged, that course is neither unusual nor at odds with *stare decisis*. See *id.*, at 474–475; see also *Brown* v. *Davenport*, 596 U. S. 118, 141 (2022) ("We neither expect nor hope that our successors will comb these pages for stray comments and stretch them beyond their context—all to justify an outcome inconsistent with this Court's reasoning and judgments").

Were there any doubt about the propriety of the Court's treatment of *Atlas Roofing*, consider one more feature of the alternative the dissent proposes. In defending the broadest possible construction of *Atlas Roofing*'s public rights discussion, the dissent necessarily endorses that decision's exceptionally narrow conception of the Seventh Amendment. See *post*, at 6. After all, as public rights expand, so too the jury-trial right must contract. Yet *Atlas Roofing*'s discussion of the jury-trial right, no less than its discussion of public rights, is difficult to square with precedent and original meaning.

Recall that, from the start, the Seventh Amendment was understood to protect that right "not merely" in suits recognized at common law, but in "*all* suits which are" of legal, as opposed to "equity [or] admiralty[,] jurisdiction." *Parsons*, 3 Pet., at 447 (emphasis added); see Part II–B, *supra*. This Court repeated that understanding of the Amendment

until well into the 1970s, noting, for example, that "the ap-
plicability of the constitutional right to jury trial in actions
enforcing statutory rights" was "a matter too obvious to be
doubted." *Curtis* v. *Loether*, 415 U. S. 189, 193 (1974) (in-
ternal quotation marks omitted); accord, *Pernell* v. *Southall
Realty*, 416 U. S. 363, 375 (1974) (the Seventh "Amendment
requires trial by jury in actions unheard of at common
law"). And the Court rejected the notion that a statute
must present "a close equivalent" to a common-law cause of
action; the jury-trial right attached, we said, so long as the
"action involve[d] rights and remedies of the sort tradition-
ally enforced in an action at law." *Ibid.*

  *Atlas Roofing* ignored all of that. Instead, it suggested,
"[t]he phrase 'Suits at common law' has been construed to
refer to cases tried *prior* to the adoption of the Seventh
Amendment in courts of law." 430 U. S., at 449 (emphasis
added). That cramped construction of the Seventh Amend-
ment was, of course, a key move in *Atlas Roofing*. For with-
out it, the Court would have been hard pressed to suggest
the public rights doctrine permits Congress to route any
"'new cause of action'" for adjudication before agencies
where juries do not sit. *Post*, at 14 (quoting *Atlas Roofing*,
430 U. S., at 461).

  Almost immediately, however, the Court rejected *Atlas
Roofing*'s analysis, not just with respect to public rights doc-
trine but the Seventh Amendment, too. Returning to our
mainstream precedents, the Court reaffirmed the applica-
bility of the Seventh Amendment to new causes of action,
first in *Tull* v. *United States*, 481 U. S. 412 (1987), and then
in *Granfinanciera*. See *ante*, at 8–9. And by 1990, our case
law had come full circle, announcing once again what has
always been true: that "[t]he right to a jury trial includes
more than the common-law forms of action recognized in
1791." *Teamsters* v. *Terry*, 494 U. S. 558, 564.

  Today, the Court respects and follows this longstanding

message in our Seventh Amendment precedents. The dissent chooses another path entirely—adopting a reading of *Atlas Roofing* that leads not only to an implausibly broad construction of public rights, but to an implausibly narrow understanding of the jury-trial guarantee as well. One wholly at odds with precedents both old and new. Nor is the dissent shy about its real motivation—and it has nothing to do with respect for precedent but much more to do with a "power grab": Holding the government to the Constitution's promise of a jury trial, the dissent insists, would impose "constraints on what," in its view, "modern-day adaptable governance must look like." *Post*, at 37. All of which, at bottom, amounts to little more than a complaint with the Constitution's revolutionary promise of popular oversight of government officials—and with those judges who would honor that promise.

\*

People like Mr. Jarkesy may be unpopular. Perhaps even rightly so: The acts he allegedly committed may warrant serious sanctions. But that should not obscure what is at stake in his case or others like it. While incursions on old rights may begin in cases against the unpopular, they rarely end there. The authority the government seeks (and the dissent would award) in this case—to penalize citizens without a jury, without an independent judge, and under procedures foreign to our courts—certainly contains no such limits. That is why the Constitution built "high walls and clear distinctions" to safeguard individual liberty. *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 239 (1995). Ones that ensure even the least popular among us has an independent judge and a jury of his peers resolve his case under procedures designed to ensure a fair trial in a fair forum. In reaffirming all this today, the Court hardly leaves the SEC without ample powers and recourse. The agency is free to pursue all of its charges against Mr.

Jarkesy.  And it is free to pursue them exactly as it had always done until 2010:  In a court, before a judge, and with a jury.  With these observations, I am pleased to concur.

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–859

_____

## SECURITIES AND EXCHANGE COMMISSION, PETITIONER *v.* GEORGE R. JARKESY, JR., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 27, 2024]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting.

Throughout our Nation's history, Congress has authorized agency adjudicators to find violations of statutory obligations and award civil penalties to the Government as an injured sovereign. The Constitution, this Court has said, does not require these civil-penalty claims belonging to the Government to be tried before a jury in federal district court. Congress can instead assign them to an agency for initial adjudication, subject to judicial review. This Court has blessed that practice repeatedly, declaring it "the 'settled judicial construction'" all along; indeed, "'from the beginning.'" *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n*, 430 U. S. 442, 460 (1977). Unsurprisingly, Congress has taken this Court's word at face value. It has enacted more than 200 statutes authorizing dozens of agencies to impose civil penalties for violations of statutory obligations. Congress had no reason to anticipate the chaos today's majority would unleash after all these years.

Today, for the very first time, this Court holds that Congress violated the Constitution by authorizing a federal agency to adjudicate a statutory right that inheres in the

Government in its sovereign capacity, also known as a public right. According to the majority, the Constitution requires the Government to seek civil penalties for federal-securities fraud before a jury in federal court. The nature of the remedy is, in the majority's view, virtually dispositive. That is plainly wrong. This Court has held, without exception, that Congress has broad latitude to create statutory obligations that entitle the Government to civil penalties, and then to assign their enforcement outside the regular courts of law where there are no juries.

Beyond the majority's legal errors, its ruling reveals a far more fundamental problem: This Court's repeated failure to appreciate that its decisions can threaten the separation of powers. Here, that threat comes from the Court's mistaken conclusion that Congress cannot assign a certain public-rights matter for initial adjudication to the Executive because it must come only to the Judiciary.

The majority today upends longstanding precedent and the established practice of its coequal partners in our tripartite system of Government. Because the Court fails to act as a neutral umpire when it rewrites established rules in the manner it does today, I respectfully dissent.

## I

The story of this case is straightforward. The Securities and Exchange Commission (SEC or Commission) investigated respondents George Jarkesy and his advisory firm Patriot28, LLC, for alleged violations of federal-securities laws in connection with the launch of two hedge funds.

In deciding how and where to enforce these laws, the SEC could have filed suit in federal court or adjudicated the matter in an administrative enforcement action subject to judicial review. See 15 U. S. C. §§77h–1, 77t, 78u, 78u–2, 78u–3, 80b–3, 80b–9. The SEC opted for the latter. In 2013, the SEC initiated an administrative enforcement action against respondents, alleging violations of the Securities

Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940. Specifically, the SEC alleged that respondents falsely told brokers and investors that: (1) a prominent accounting firm would audit the hedge funds; (2) a prominent investment bank would serve as the funds' prime broker; and (3) one of the funds would invest 50% of its capital in certain life-insurance policies. In reality, the audit never took place, the bank never opened a prime brokerage account, and the hedge fund invested less than 20% of its capital in the life-insurance policies. In addition to misrepresenting the funds' investment strategies, respondents allegedly overvalued the funds' holdings to charge higher management fees.

The SEC assigned the action to one of its administrative law judges, who held an evidentiary hearing and issued a lengthy initial decision, concluding that respondents in fact had violated the three securities laws. The full Commission reviewed the initial decision and reached the same determination. The Commission also denied respondents' constitutional challenges to the order, including that the agency's in-house adjudication violated respondents' Seventh Amendment right to a jury trial in federal court. Ultimately, the SEC ordered respondents to pay a civil penalty of $300,000 and to cease and desist from violating the federal-securities laws. It also barred Jarkesy from doing certain things in the securities industry and ordered Patriot28 to disgorge $685,000 in illicit profits.

Respondents filed a petition for review in the Fifth Circuit. 34 F. 4th 446, 466 (2022). A divided panel granted the petition and vacated the SEC's order. The panel held, over the dissent of Judge Davis, that respondents were entitled to a jury trial in federal court under the Seventh Amendment because the federal-securities antifraud provisions were similar to common-law fraud claims to which the jury-trial right would attach. See *id.*, at 451–459. Because the SEC forced respondents to proceed within the agency, the

Court of Appeals held that the SEC violated respondents'
Seventh Amendment rights and thus vacated the SEC's or-
der.  *Id.*, at 465–466.[1]

The majority affirms the Fifth Circuit's decision, notwith-
standing the mountain of precedent against it.  A faithful
application of our precedent would have led, inexorably, to
upholding the statutory scheme that Congress enacted for
the SEC's in-house adjudication of federal-securities
claims.

## II

The majority did not need to break any new ground to
resolve respondents' Seventh Amendment challenge.  This
Court's longstanding precedent and established govern-
ment practice uniformly support the constitutionality of ad-
ministrative schemes like the SEC's: agency adjudications
of statutory claims for civil penalties brought by the Gov-
ernment in its sovereign capacity.  See Part II–B (*infra*, at
7–14).  In assessing the constitutionality of such adjudica-
tions, the political branches' "'[l]ong settled and established
practice,'" which this Court has upheld and reaffirmed time
and again, is entitled to "'great weight.'"  *Chiafalo* v. *Wash-*
*ington*, 591 U. S. 578, 592–593 (2020) (quoting *The Pocket*
*Veto Case*, 279 U. S. 655, 689 (1929)); accord, *Vidal* v. *El-*
*ster*, 602 U. S. 286, 323 (2024) (BARRETT, J., concurring in
part); *id.*, at 330 (SOTOMAYOR, J., concurring in judgment);
*Consumer Financial Protection Bureau* v. *Community Fi-*
*nancial Services Assn. of America, Ltd.*, 601 U. S. 416, 442

---

[1] As the majority notes, respondents also prevailed on two other con-
stitutional challenges in the Court of Appeals.  See *ante*, at 6.  The di-
vided panel concluded that: (1) the SEC's discretion to bring the case
within the agency instead of federal court violated the nondelegation doc-
trine; and (2) a for-cause restriction on the Administrative Law Judge's
removal violated Article II and the separation of powers.  34 F. 4th 446,
459–465 (CA5 2022).  I disagree with the ruling below on both points.
Because the majority does not reach these issues, though, I address only
the Seventh Amendment challenge discussed in the majority's opinion.

(2024) (KAGAN, J., concurring).

A

There are two key constitutional provisions at issue here. One is the Seventh Amendment, which "preserve[s]" the "right of trial by jury" in "Suits at common law, where the value in controversy shall exceed twenty dollars." The other is Article III's Vesting Clause, which provides that the "judicial Power of the United States . . . shall be vested" in federal Article III courts. This case presents the familiar interplay between these two provisions.

Although this case involves a Seventh Amendment challenge, the principal question at issue is one rooted in Article III and the separation of powers. That is because, as the majority rightly acknowledges, the Seventh Amendment's jury-trial right "applies" only in "an Article III court." *Ante,* at 7. That conclusion follows from both the text of the Constitution and this Court's precedents.

As to the text, the Amendment is limited to "Suits at common law." That means two things. First, that the right applies only in judicial proceedings. The term "suit," after all, refers to "the prosecution of some demand in a Court of justice," *Cohens* v. *Virginia*, 6 Wheat. 264, 407 (1821) (Marshall, C. J.), or a "proceeding in a court of justice," *Weston* v. *City Council of Charleston*, 2 Pet. 449, 464 (1829) (same) ("The modes of proceeding may be various, but if a right is litigated between parties in a court of justice, the proceeding by which the decision of the court is sought, is a suit"). Consistent with that understanding, this Court has held repeatedly that "the Seventh Amendment is not applicable to administrative proceedings." *Tull* v. *United States,* 481 U. S. 412, 418, n. 4 (1987); accord, *Atlas Roofing*, 430 U. S., at 454–455; *Curtis* v. *Loether*, 415 U. S. 189, 195 (1974). Factfinding by a jury is "incompatible with the whole concept of administrative adjudication," which empowers executive officials to find the relevant facts and apply the law to

those facts like juries do in a courtroom. *Pernell* v. *Southall Realty*, 416 U. S. 363, 383 (1974) (collecting cases).

Second, the requirement that the "'[s]uit'" must be one "'at common law'" means that the claim at issue must be "'legal in nature.'" *Ante,* at 8. So, whether a defendant is entitled to a jury under the Seventh Amendment depends on both the forum and the cause of action. If the claim is in an Article III proceeding, then the right to a jury attaches if the claim is "legal in nature" and the amount in controversy exceeds $20. *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33, 53 (1989); *Atlas Roofing*, 430 U. S., at 454, n. 12, 461, n. 16. Yet when, as here, the claim proceeds in a non-Article III forum, the relevant question becomes whether "Congress properly assign[ed the] matter" for decision to that forum consistent with Article III and the separation of powers. *Oil States Energy Services, LLC* v. *Greene's Energy Group, LLC*, 584 U. S. 325, 345 (2018). In other words, the question is whether Congress improperly bestowed federal judicial power on a non-Article III forum. See *id.*, at 334 (Congress cannot "'confer the Government's "judicial Power" on entities outside Article III'" (quoting *Stern* v. *Marshall*, 564 U. S. 462, 484 (2011))).[2]

The conclusion that Congress properly assigned a matter to an agency for adjudication therefore necessarily "resolves [any] Seventh Amendment challenge." *Oil States*, 584 U. S., at 345 (explaining that if non-Article III adjudication

─────────

[2]Since the founding, Executive Branch officials have adjudicated certain matters, while others have required resolution in an Article III court. An executive official properly vested with the authority to find facts, apply the law to those facts, and impose the consequences prescribed by law exercises executive power under Article II, not judicial power under Article III. See *Arlington* v. *FCC*, 569 U. S. 290, 305, n. 4 (2013) (explaining that agency rulemaking and adjudications may "take 'legislative' and 'judicial' forms, but they are exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power'" (quoting Art. II, §1, cl. 1)).

is permissible, then "'the Seventh Amendment poses no independent bar to the adjudication of that action by a non-jury factfinder'" (quoting *Granfinanciera*, 492 U. S., at 53–54)); see W. Baude, Adjudication Outside Article III, 133 Harv. L. Rev. 1511, 1571 (2020) ("The Article III analysis should be conducted first, on its own. And then . . . if the non-Article III adjudication is permissible, the Seventh Amendment should be ignored"). When executive power is at stake, Congress does not violate Article III or the Seventh Amendment by authorizing a nonjury factfinder to adjudicate the dispute.

So, the critical issue in this type of case is whether Congress can assign a particular matter to a non-Article III factfinder.

## B

For more than a century and a half, this Court has answered that Article III question by pointing to the distinction between "private rights" and "public rights." See *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 284 (1856) (recognizing public-rights exception). The distinction is helpful because public rights always can be assigned outside of Article III. They "'do not require judicial determination'" under the Constitution, even if they "'are susceptible of it.'" *Crowell* v. *Benson*, 285 U. S. 22, 50 (1932) (quoting *Ex parte Bakelite Corp.*, 279 U. S. 438, 451 (1929)).

The majority says that aspects of the public-rights doctrine have been confusing. See *ante,* at 17. That might be true for cases involving wholly private disputes, but not for cases where the Government is a party.[3] It has long been

--------

[3]Every case that has expressed consternation about the precise contours of the public-rights doctrine, including those cited by the majority, involve only private disputes—or, more precisely, "disputes to which the Federal Government is not a party in its sovereign capacity." *Granfi-*

settled and undisputed that, at a minimum, a matter of
public rights arises "between the government and persons
subject to its authority in connection with the performance
of the constitutional functions of the executive or legislative
departments." *Crowell*, 285 U. S., at 50; *Oil States*, 584
U. S., at 335 (describing the "Court's longstanding formula-
tion of the public-rights doctrine"); accord, *Granfinanciera*,
492 U. S., at 51, and n. 8; *Atlas Roofing*, 430 U. S., at 452,
457; *Ex parte Bakelite Corp.*, 279 U. S., at 451. Indeed,
"from the time the doctrine of public rights was born, in
1856," everyone understood that public rights "'arise "be-
tween the government and others,"'" and refer to "rights *of
the public*—that is, rights pertaining to claims brought by
or against the United States." *Granfinanciera*, 492 U. S.,
at 68–69 (Scalia, J., concurring in part and concurring in
judgment); see *ibid.* (collecting sources). So, while this
Court has recognized public rights in certain disputes be-
tween private parties, see *infra*, at 19–20, the doctrine's
heartland consists of claims belonging to the Government.

When a claim belongs to the Government as sovereign,
the Constitution permits Congress to enact new statutory
obligations, prescribe consequences for the breach of those
obligations, and then empower federal agencies to adjudi-
cate such violations and impose the appropriate penalty.
See *Atlas Roofing*, 430 U. S., at 450–455 (collecting cases).[4]

---

*nanciera, S. A.* v. *Nordberg*, 492 U. S. 33, 55, n. 10 (1989) (involving dis-
pute between private parties in bankruptcy court); see *ante*, at 17 (citing
*Oil States Energy Services, LLC* v. *Greene's Energy Group, LLC*, 584 U. S.
325, 332–334 (2018) (involving patent dispute between private parties
before the U. S. Patent and Trademark Office); *Thomas* v. *Union Carbide
Agricultural Products Co.*, 473 U. S. 568, 575 (1985) (involving challenge
to arbitration procedure for private parties disputing data compensation
under federal pesticide registration program)); see also *Stern* v. *Mar-
shall*, 564 U. S. 462, 469–470 (2011) (involving dispute between private
parties in bankruptcy court); *Northern Pipeline Constr. Co.* v. *Marathon
Pipe Line Co.*, 458 U. S. 50, 56–57 (1982) (plurality opinion) (same).

[4] Judicial review of these agency decisions allows Congress to avoid

This Court has repeatedly emphasized these unifying principles through an unbroken series of cases over almost 200 years.

1

Start at the beginning, with *Murray's Lessee* in 1856. In that case, the Government issued a warrant to compel a federal customs collector to produce public funds that the Government determined the collector had unlawfully withheld. See 18 How., at 274–275. The Government executed the warrant to seize and sell a plot of the collector's land to make up for the withheld funds. See *id.*, at 274. In upholding the sale of the seized property, this Court concluded that the Government's in-house assessment and collection of taxes and penalties based on a federal official's adjudication of the facts did not violate Article III. The scheme was

_____

any due process concerns that might arise from having executive officials deprive someone of their property without review in an Article III court. See *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n*, 430 U. S. 442, 455, n. 13 (1977) ("[T]hese cases do not present the question whether Congress may commit the adjudication of public rights and the imposition of fines for their violation to an administrative agency without any sort of intervention by a court at any stage of the proceedings"); accord, *Oil States*, 584 U. S., at 344 (same); Tr. of Oral Arg. 29 (Principal Deputy Solicitor General) (stating that "the Court has emphasized that judicial review of agency action may well be required" and the Due Process Clause may "ha[ve] something to say" about that requirement). The concurrence reproaches this dissent for declining to address any potential deficiencies in this administrative scheme, as well as failing to specify which forms of judicial review may be constitutionally required, see *ante,* at 22 (opinion of GORSUCH, J.), even though respondents did not raise any due process challenge in this case. Deciding whether this statutory scheme is procedurally deficient and so circumscribes judicial review that it violates due process would be inconsistent with the "settled principles of party presentation and adversarial testing." *Vidal* v. *Elster*, 602 U. S. 286, 328 (2024) (SOTOMAYOR, J., concurring in judgment) (citing *Maslenjak* v. *United States*, 582 U. S. 335, 354 (2017) (GORSUCH, J., joined by THOMAS, J., concurring in part and concurring in judgment)).

constitutional, the Court said, because "public rights" were
at issue. *Id.*, at 284. In other words, the dispute arose be-
tween the Government and the customs collector in connec-
tion with the Government's exercise of its constitutional
power to collect revenue. Congress could have brought such
claims, if it wanted, "within the cognizance of the courts of
the United States, as it may deem proper." *Ibid.* The Court
thus endorsed that constitutional balance: Congress could
decide whether to assign a public-rights dispute to the Ex-
ecutive for initial adjudication subject to judicial review or
to an Article III federal court for resolution.

Fast forward half a century. In *Oceanic Steam Nav. Co.*
v. *Stranahan*, 214 U. S. 320, 338–340 (1909), the Court up-
held a customs official's imposition of a penalty on a steam-
ship company that violated immigration laws barring the
entry of certain classes of people into the country. The cus-
toms official determined the facts, adjudicated the viola-
tion, and enforced the statutory prohibition on immigration
through the assessment of a monetary penalty. See *id.*, at
329. The Court noted the breadth of Congress's immigra-
tion power and held that the civil-penalty statutory scheme
at issue was "beyond all question constitutional." *Id.*, at
342. Yet, far from restricting the public-rights doctrine to
this particular exercise of congressional power or to specific
prerogatives, the *Stranahan* Court went out of its way to
explain that the "settled judicial construction" that civil-
penalty claims brought by the Government could be as-
signed to the Executive for initial adjudication extended
"not only as to tariff, but as to internal revenue, taxation,
and other subjects," including the regulation of foreign com-
merce. *Id.*, at 339; see also *id.*, at 334–335.

Importantly, *Stranahan* rejected the "proposition" that,
in "cases of penalty or punishment, . . . enforcement must
depend upon the exertion of judicial power, either by civil
or criminal process." *Id.*, at 338. In words that could have

been written in response to today's ruling, the Court explained that such a "proposition magnifies the judicial to the detriment of all other departments of the Government, disregards many previous adjudications of this court, and ignores practices often manifested and hitherto deemed to be free from any possible constitutional question." *Ibid.* For that reason, the validity of legislation authorizing the non-Article III adjudication of civil-penalty claims does not turn on the Judiciary's assessment of whether it is necessary for executive officials "to enforce designated penalties without resort to the courts." *Id.*, at 339. Whether or not such legislation violates Article III depends on whether Congress acted pursuant to a "grant of power made by the Constitution," and not on whether it "relate[s] to subjects peculiarly within the authority of the legislative department of the Government" or on the circumstances that might have "caused Congress to exert a specified power." *Id.*, at 339–340.

By the time *Stranahan* was decided, Congress already routinely "impose[d] appropriate obligations and sanction[ed] their enforcement by reasonable money penalties, giving to executive officers the power to enforce such penalties without the necessity of invoking the judicial power." *Id.*, at 339. Far from limiting the public-rights doctrine to the particular context in *Stranahan* and prior cases, this Court has expressly rejected the notion that the public-rights doctrine is so confined. See *infra*, at 18–19. This Court has repeatedly approved Congress's assignment of public rights to agencies in diverse areas of the law, reflecting Congress's varied constitutional powers.[5] A nonexhaustive list includes "interstate and foreign commerce, taxation, immigration, the public lands, public health, the

_____

[5] The majority's fixation on this dissent's discussion of *Stranahan*, see *ante*, at 16, n. 1, misses the fact that *Stranahan* exists within a long line of cases recognizing the diverse areas of the law comprising the public-rights doctrine.

facilities of the post office, pensions, and payments to vet-
erans," *Crowell*, 285 U. S., at 51, and n. 13 (collecting
cases); see also, *e.g.*, *Helvering* v. *Mitchell*, 303 U. S. 391,
401–404 (1938) (administrative penalty for underpayment
of taxes); *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S.
1, 22–24, 48–49 (1937) (reinstatement of dismissed em-
ployee and backpay in adjudication of unfair-labor-prac-
tices claim under the National Labor Relations Act); *Phil-
lips* v. *Commissioner*, 283 U. S. 589, 591–592 (1931)
(deficiency assessments for unpaid taxes); *Lloyd Sabaudo
Societa Anonima per Azioni* v. *Elting*, 287 U. S. 329, 334–
335 (1932) (fines for violation of immigration law barring
entry of certain classes of individuals); *Ex parte Bakelite
Corp.*, 279 U. S., at 446–447, 451, 458 (adjudication of un-
fair-methods-of-competition and unfair-acts claims, and im-
position of additional duties under customs law); *Passavant*
v. *United States*, 148 U. S. 214, 215–216, 220 (1893) (pen-
alty for undervaluation of imported merchandise).

The list could go on and on. That is because, in every case
where the Government has acted in its sovereign capacity
to enforce a new statutory obligation through the adminis-
trative imposition of civil penalties or fines, this Court,
without exception, has sustained the statutory scheme au-
thorizing that enforcement outside of Article III.

2

A unanimous Court made this exact point nearly half a
century ago in *Atlas Roofing*. That was the last time this
Court considered a public-rights case where the constitu-
tionality of an in-house adjudication of statutory claims
brought by the Government was at issue. That case pre-
sented the same question as this one: Whether the Seventh
Amendment permits Congress to commit the adjudication
of a new cause of action for civil penalties to an administra-
tive agency. 430 U. S., at 444. The Court said it did.

In *Atlas Roofing*, the Court explained how Congress identified a national problem, concluded that existing legal remedies were inadequate to address it, and then created a new statutory scheme that endorsed Executive in-house enforcement as a solution. Specifically, Congress found "that work-related deaths and injuries had become a 'drastic' national problem," and that existing causes of action, including tort actions for negligence and wrongful death, did not adequately "protect the employee population from death and injury due to unsafe working conditions." *Id.*, at 444–445. In response, Congress enacted the Occupational Safety and Health Act of 1970 (OSHA) to require employers "to avoid maintaining unsafe or unhealthy working conditions." *Id.*, at 445. OSHA in turn "empower[ed] the Secretary of Labor to promulgate health and safety standards," and the Occupational Safety and Health Review Commission to impose civil penalties on employers maintaining unsafe working conditions, regardless of whether any worker was in fact injured or killed. *Id.*, at 445–446.

Two employers that had been assessed civil penalties for OSHA violations resulting in the death of employees challenged the constitutionality of the statute's enforcement procedures. They observed that "a suit in a federal court by the Government for civil penalties for violation of a statute is a suit for a money judgment[,] which is classically a suit at common law." *Id.*, at 449. Therefore, the employers claimed, the Seventh Amendment right to a jury attached and Congress could not assign the matter to an agency for resolution. See *ibid.*

This Court upheld OSHA's statutory scheme. It relied on the long history of public-rights cases endorsing Congress's now-settled practice of assigning the Government's rights to civil penalties for violations of a statutory obligation to in-house adjudication in the first instance. See *id.*, at 450–455. In light of this "history and our cases," the Court con-

cluded that, where Congress "create[s] a new cause of ac-
tion, and remedies therefor, unknown to the common law,"
it is free to "plac[e] their enforcement in a tribunal supply-
ing speedy and expert resolutions of the issues involved."
*Id.*, at 460–461. "That is the case even if the Seventh
Amendment would have required a jury where the adjudi-
cation of those rights is assigned to a federal court of law."
*Id.*, at 455; see *id.*, at 461, n. 16.

The "new rule" and "legally unsound principle" that the
majority accuses this dissent of "unfurl[ing]" today, *ante,* at
17–18, n. 2, is the one that this Court declared "'settled ju-
dicial construction' . . . 'from the beginning'": "[T]he Gov-
ernment could commit the enforcement of statutes and the
imposition and collection of fines . . . for administrative en-
forcement, without judicial trials," even if the same action
would have required a jury trial if committed to an Article
III court. *Atlas Roofing*, 430 U. S., at 460 (collecting cases);
accord, *Elting*, 287 U. S., at 334 (Congress "may lawfully
impose appropriate obligations, sanction their enforcement
by reasonable money penalties, and invest in administra-
tive officials the power to impose and enforce them");
*Stranahan*, 214 U. S., at 339 (Congress may "impose appro-
priate obligations and sanction their enforcement by rea-
sonable money penalties, giving to executive officers the
power to enforce such penalties without the necessity of in-
voking the judicial power").

## C

It should be obvious by now how this case should have
been resolved under a faithful and straightforward applica-
tion of *Atlas Roofing* and a long line of this Court's prece-
dents. The constitutional question is indistinguishable.
The majority instead wishes away *Atlas Roofing* by burying
it at the end of its opinion and minimizing the unbroken
line of cases on which *Atlas Roofing* relied. That approach

to precedent significantly undermines this Court's commitment to *stare decisis* and the rule of law.

This case may involve a different statute from *Atlas Roofing*, but the schemes are remarkably similar. Here, just as in *Atlas Roofing*, Congress identified a problem; concluded that the existing remedies were inadequate; and enacted a new regulatory scheme as a solution. The problem was a lack of transparency and accountability in the securities market that contributed to the Great Depression of the 1930s. See *ante,* at 1. The inadequate remedies were the then-existing state statutory and common-law fraud causes of action. The solution was a comprehensive federal scheme of securities regulation consisting of the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940. See *ibid.* In particular, Congress enacted these securities laws to ensure "full disclosure" and promote ethical business practices "in the securities industry," *SEC* v. *Capital Gains Research Bureau, Inc.*, 375 U. S. 180, 186 (1963), as well as to "protect investors against manipulation of stock prices," *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 195 (1976).

The prophylactic nature of the statutory regime also is virtually indistinguishable from the OSHA scheme at issue in *Atlas Roofing*. Among other things, these securities laws prohibit the misrepresentation or concealment of various material facts through the imposition of federal registration and disclosure requirements. See *ante,* at 2. Critically, federal-securities laws do not require proof of actual reliance on an investor's misrepresentations or that an "investor has actually suffered financial loss." *Ante,* at 4; see also *SEC* v. *Life Partners Holdings, Inc.* 854 F. 3d 765, 779 (CA5 2017); *SEC* v. *Blavin*, 760 F. 2d 706, 711 (CA6 1985) (*per curiam*). OSHA too prohibits conduct that could, but does not necessarily, injure a private person. *Atlas Roofing*, 430 U. S., at 445 (OSHA remedies "exis[t] whether or not an employee is

actually injured or killed as a result of the [unsafe or un-
healthy working] condition"). The employer's failure to
maintain safe and healthy working conditions violates
OSHA even if there is no actionable harm to an employee,
just as a misrepresentation to investors in connection with
the buying or selling of securities violates federal-securities
law even if there is no actual injury to the investors.

Moreover, both here and in *Atlas Roofing*, Congress em-
powered the Government to institute administrative en-
forcement proceedings to adjudicate potential violations of
federal law and impose civil penalties on a private party for
those violations, all while making the final agency decision
subject to judicial review. In bringing a securities claim,
the SEC seeks redress for a "violation" that "is committed
against the United States rather than an aggrieved individ-
ual," which "is why, for example, a securities-enforcement
action may proceed even if victims do not support or are not
parties to the prosecution." *Kokesh* v. *SEC*, 581 U. S. 455,
463 (2017). Put differently, the SEC seeks to "'remedy
harm to the public at large'" for violation of the Govern-
ment's rights. *Ibid.* The Government likewise seeks to
remedy a public harm when it enforces OSHA's prohibition
of unsafe working conditions.

Ultimately, both cases arise between the Government
and others in connection with the performance of the Gov-
ernment's constitutional functions, and involve the Govern-
ment acting in its sovereign capacity to bring a statutory
claim on behalf of the United States in order to vindicate
the public interest. They both involve, as *Atlas Roofing* put
it, "new cause[s] of action, and remedies therefor, unknown
to the common law." 430 U. S., at 461. Neither Article III
nor the Seventh Amendment prohibits Congress from as-
signing the enforcement of these new "Governmen[t] rights
to civil penalties" to non-Article III adjudicators, and thus
"supplying speedy and expert resolutions of the issues in-
volved." *Id.*, at 450, 461. In a world where precedent means

something, this should end the case. Yet here it does not.

## III

The practice of assigning the Government's right to civil penalties for statutory violations to non-Article III adjudication had been so settled that it become an undisputable reality of how "our Government has actually worked." *Consumer Financial Protection Bureau*, 601 U. S., at 445 (KAGAN, J., concurring). That is why the Court has had no cause to address this kind of constitutional challenge since its unanimous decision in *Atlas Roofing*. The majority takes a wrecking ball to this settled law and stable government practice. To do so, it misreads this Court's precedents, ignores those that do not suit its thesis, and advances distinctions created from whole cloth.

The majority's treatment of the public-rights doctrine is not only incomplete, but is gerrymandered to produce today's result. See Part III–A (*infra*, at 17–21). Unable to explain that doctrine, the majority effectively ignores the Article III threshold question to focus instead on two Seventh Amendment cases: *Tull* v. *United States*, 481 U. S. 412 (1987), and *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33 (1989). Neither involved the in-house adjudication of statutory claims brought by the Government pursuant to its sovereign powers, which is the critical fact under this Court's precedent. See Part III–B–1 (*infra*, at 22–24) (discussing *Tull*); Part III–B–2 (*infra*, at 24–29) (discussing *Granfinanciera*). The majority and the concurrence then predictably fail to distinguish *Atlas Roofing*, which resolved the Seventh Amendment question for cases like this one implicating that critical fact. See Part III–C (*infra*, at 29–32).

## A

To start, it is almost impossible to discern how the majority defines a public right and whether its view of the doctrine is consistent with this Court's public-rights cases. The

majority at times seems to limit the public-rights exception
to areas of its own choosing.  It points out, for example, that
some public-rights cases involved the collection of revenue,
customs law, and immigration law, see *ante*, at 14–17, and
that *Atlas Roofing* involved OSHA and not "civil penalty
suits for fraud," *ante*, at 22.[6]  Other times, the majority
highlights a particular practice predating the founding,
such as the "unbroken tradition" in *Murray's Lessee* of ex-
ecutive officials issuing warrants of distress to collect reve-
nue.  *Ante*, at 15; see also *ante*, at 13–14 (GORSUCH, J., con-
curring).  Needless to say, none of these explanations for
the doctrine is satisfactory.  What is the legal principle be-
hind saying only these areas and no further?  This Court
has rejected that kind of arbitrary line-drawing in cases
like *Stranahan* and *Atlas Roofing*.  How does the require-
ment of a historical practice dating back to the founding, or
"flow[ing] from centuries-old rules," *ante*, at 17, account for
the broad universe of public-rights cases in the United
States Reporter?  The majority does not say.

The majority's only other theory fares no better.  The ma-
jority seems to suggest that a common thread underlying
these cases is that "the political branches had traditionally
held exclusive power over th[ese] field[s] and had exercised
it."  *Ante,* at 16–17.  To the extent the majority thinks this
is a distinction, it fails for at least two reasons.

First, *Atlas Roofing* expressly rejected the argument that
the public-rights doctrine is limited to particular exercises
of congressional power.  The employers in *Atlas Roofing* ar-
gued "that cases such as *Murray's Lessee*, *Elting*, [*Strana-
han*], *Phillips*, and *Helvering* all deal with the exercise of
sovereign powers that are inherently in the exclusive do-

---

[6]The majority also cites cases involving "relations with Indian tribes,
the administration of public lands, and the granting of public benefits
such as payments to veterans, pensions, and patent rights."  *Ante*, at 17
(citations omitted).

main of the Federal Government and critical to its very existence—the power over immigration, the importation of goods, and taxation." 430 U. S., at 456. Cabining the cases in that way, the employers argued that "[t]he theory of those cases is inapplicable where the Government exercises other powers that [they] regard[ed] as less fundamental, less exclusive, and less vital to the existence of the Nation, such as the power to regulate commerce among the several States, the latter being the power Congress sought to exercise in enacting [OSHA]." *Ibid.* The Court rejected the employers' argument, explaining that nothing in those cases turned on those particular exercises of the Government's authority. See *id.*, at 456–457; cf. *Crowell*, 285 U. S., at 51 (offering a list of "[f]amiliar illustrations of . . . exercise[s]" of Congress's constitutional authority that have fallen within the public-rights exception to Article III).

Second, even if *Atlas Roofing* had not explicitly rejected the proposed distinction here, the majority cannot reconcile its restrictive view of the public-rights doctrine with *Atlas Roofing* and other precedents. For example, it is unclear how OSHA, or the National Labor Relations Act at issue in *Jones & Laughlin*, would fit the majority's view of the public-rights doctrine, or why the exercise of interstate-commerce power to enact those statutes would be any different from the exercise of that same power to enact the federal-securities laws at issue here. See *Atlas Roofing*, 430 U. S., at 457 ("It is also apparent that *Jones & Laughlin*, *Pernell*, and *Curtis* are not amenable to the limitations suggested by [the employers]").

The majority's description of the doctrine also fails to account for public rights that do not belong to the Federal Government in its sovereign capacity. See *Granfinanciera*, 492 U. S., at 54 ("[T]he Federal Government need not be a party for a case to revolve around 'public rights'"). This Court, after all, has rejected the confinement of public rights to that heartland. See *ibid.* ("[W]e [have] rejected the

view that 'a matter of public rights must at a minimum arise "between the government and others"'"). Conspicuously absent from the majority's discussion are, for example, cases in which this Court held that Congress could assign a private federally created action that was "closely integrated into a public regulatory scheme" for adjudication in a non-Article III forum. *Thomas* v. *Union Carbide Agricultural Products Co.*, 473 U. S. 568, 594 (1985). These cases include, for example, an agency's adjudication of state-law counterclaims to an investor's federal action against its broker, *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833, 835–836, 847–850 (1986), and the arbitration of data-compensation disputes among participants in the Environmental Protection Agency's pesticide registration scheme, *Thomas*, 473 U. S., at 571, 589–592. Both *Thomas* and *Schor* thus upheld the non-Article III adjudication of disputes between private parties, which naturally did not involve the Government in its sovereign capacity.

Even accepting the majority's public-rights-are-confusing defense, its "strategy for dealing with the confusion is not to offer a theory for rationalizing this body of law," but to provide an incomplete and unprincipled account of the doctrine. *Haaland* v. *Brackeen*, 599 U. S. 255, 279 (2023). The majority references, but does not explain, "distinctions our cases have drawn," *ante*, at 18, n. 2, also cherry-picking some cases and ignoring others. Indeed, in lieu of a coherent theory, all the majority has to offer is a list of five "historic categories of adjudications [that] fall within the exception," *ante*, at 14–17, and maybe (just maybe) OSHA, which the majority reluctantly adds to the mix at the end of its opinion for good measure, see *ante*, at 22–24. The majority ignores countless public-rights cases and entire strands of the doctrine, and fails to heed its own admonition that "close attention" must be paid "to the basis for each asserted

application of the doctrine." *Ante,* at 17.[7]

The majority also attacks a strawman when it asserts that "precedents foreclose th[e] argument" that the public-rights doctrine "applies whenever a statute increases governmental efficiency." *Ante,* at 26; see also *ante,* at 19 (GORSUCH, J., concurring). No one has made that argument in this case; not the Government and certainly not this dissent. The fact that certain rights might be susceptible to speedy and expert resolution through non-Article III adjudication is not what makes them "rights *of the public*—that is, rights pertaining to claims brought by or against the United States." *Granfinanciera,* 492 U. S., at 68–69 (Scalia, J., concurring in part and concurring in judgment).

It is not clear what else, if anything, might qualify as a public right, or what is even left of the doctrine after today's opinion. Rather than recognize the long-settled principle that a statutory right belonging to the Government in its sovereign capacity falls within the public-rights exception to Article III, the majority opts for a "we know it when we see it" formulation. This Court's precedents and our coequal branches of Government deserve better.

## B

Rather than relying on *Atlas Roofing* or the relevant public-rights cases, the majority instead purports to follow *Tull* and *Granfinanciera.* The former involved a suit in federal court and the latter involved a dispute between private parties. So, just like that, the majority ventures off on the wrong path. Indeed, as explained below, both the majority and the concurrence miss the critical distinction drawn in

––––––––
[7] Among other things, the concurrence accuses this dissent of behaving like a "picky child at the dinner table." *Ante,* at 21 (opinion of GORSUCH, J.). The precedents, though, speak for themselves. It is the majority and concurrence that pick and choose among public-rights cases, excluding broad strands of precedent constituting the doctrine.

this Court's precedents between the non-Article III adjudi-
cation of public-rights matters involving the liability of one
individual to another and those involving claims belonging
to the Government in its sovereign capacity.

According to the majority, respondents are entitled to a
jury trial in federal court because, as here, *Tull* involved a
Government claim for civil penalties, and *Granfinanciera*
looked to the common law to determine if a statutory cause
of action was legal in nature. By focusing on the remedy in
this case, and the perceived similarities between the statu-
tory cause of action and a common-law analogue, the ma-
jority elides the critical distinction between those cases and
this one: Whether Congress assigned the Government's sov-
ereign rights to civil penalties to a non-Article III factfinder
for adjudication.

1

The majority bafflingly proclaims that "the remedy is all
but dispositive" in this case, *ante,* at 9, ignoring that *Atlas
Roofing* and countless precedents before it rejected that
proposition. Not content to take just a page from the em-
ployers' challenge in *Atlas Roofing*, the majority has taken
their whole brief, resuscitating yet another theory that this
Court has long foreclosed. The employers in *Atlas Roofing*
argued that the Seventh Amendment prohibited Congress
from assigning to an agency the same remedy at issue here:
civil penalties. See 430 U. S., at 450 ("Petitioners . . . claim
that . . . assign[ing] the function of adjudicating the Gov-
ernment's rights to civil penalties for [a statutory] violation
. . . deprive[s] a defendant of his Seventh Amendment jury
right"). This Court rejected that argument outright, citing
a long line of cases involving the Executive's adjudication of
statutory claims for civil penalties brought by the Govern-
ment in its sovereign capacity. *Id.*, at 450–455 (collecting
cases).

As discussed above, this Court has long endorsed statutory schemes authorizing agency adjudicators to find violations and award civil penalties to the Government. See *supra*, at 9–12. Long before *Atlas Roofing*, this Court held that the Constitution permits Congress to enact statutory obligations and then "sanction their enforcement by reasonable money penalties" by government officials "without the necessity of invoking the judicial power." *Stranahan*, 214 U. S., at 339; see *id.*, at 338–339 (collecting cases). That the SEC imposed civil penalties on respondents therefore has little, if any, bearing on the resolution of this case.

Again, even if over a century of precedent did not foreclose the majority's argument, it fails on its own terms. The majority relies almost entirely on *Tull*, which held that statutory claims for civil penalties were "a type of remedy at common law" that entitled a defendant to a jury trial. 481 U. S., at 422; see *id.*, at 425. Critically, however, the *Tull* Court's analysis took place in an entirely different context: federal court. See *ante,* at 8–9 ("In [*Tull*], the Government sued a real estate developer for civil penalties [under the Clean Water Act] *in federal court*" (emphasis added)). *Tull* did not present the question at issue in *Atlas Roofing* and other cases involving non-Article III adjudication of Government claims in the first instance. Rather, *Tull* stands for the unremarkable proposition that, when the Government sues an entity for civil penalties in federal district court, the Seventh Amendment entitles the defendant "to a jury trial to determine his liability on the legal claims." 481 U. S., at 425.

That conclusion says nothing about the constitutionality of the SEC's in-house adjudicative scheme. *Atlas Roofing* and its predecessors could not have been clearer on this point: Congress can assign the enforcement of a statutory obligation for in-house adjudication to executive officials, "even if the Seventh Amendment would have required a jury where the adjudication of those rights is assigned to a

federal court of law instead of an administrative agency." 430 U. S., at 455. Although "the Government could commit the enforcement of statutes and the imposition and collection of fines to the judiciary, in which event jury trial would be required," the Government "could also validly opt for administrative enforcement, without judicial trials." *Id.*, at 460 (citing *Stranahan*, 214 U. S., at 339; *Hepner* v. *United States*, 213 U. S. 103 (1909); *United States* v. *Regan*, 232 U. S. 37 (1914); *Helvering*, 303 U. S., at 402–403; *Crowell*, 285 U. S., at 50–51); *Curtis*, 415 U. S., at 195 (explaining that Congress can "entrust [the] enforcement of statutory rights to an administrative process . . . free from the strictures of the Seventh Amendment," but must abide by the Amendment when it does so "in an ordinary civil action in the district courts").

It would have been quite remarkable for *Tull*, which involved a claim in federal court, to overrule silently more than a century of caselaw involving non-Article III adjudications of the Government's rights to civil penalties for statutory violations. Of course, *Tull* did no such thing. *Tull* even reaffirmed *Atlas Roofing* by emphasizing that the Seventh Amendment depends on the forum, not just the remedy, because it "is not applicable to administrative proceedings." 481 U. S., at 418, n. 4 (citing *Atlas Roofing*, 430 U. S., at 454; *Pernell*, 416 U. S., at 383). For the majority to pretend otherwise is wishful thinking at best.

2

The majority next argues that the "close relationship" between the federal-securities laws and common-law fraud "confirms that this action is 'legal in nature,'" and entitles respondents to a jury trial. *Ante,* at 13. That argument does not fare any better than the argument on remedy. Again, the majority bends inapposite case law to an illogical thesis. *Granfinanciera*, on which the majority relies to make its cause-of-action argument, set forth the public-

rights analysis only for "disputes to which the Federal Gov-
ernment is not a party in its sovereign capacity."  492 U. S.,
at 55, n. 10.  For cases that, as here, involve the Govern-
ment in its sovereign capacity, the *Granfinanciera* Court
plainly stated that "Congress may fashion causes of action
that are closely *analogous* to common-law claims and [still]
place them beyond the ambit of the Seventh Amendment by
assigning their resolution to a [non-Article III] forum in
which jury trials are unavailable." *Id.*, at 52 (citing *Atlas
Roofing*, 430 U. S., at 450–461).[8]

The Court held in *Granfinanciera* that "a person who has
not submitted a claim against a bankruptcy estate has a
right to a jury trial when sued by the trustee in bankruptcy
to recover an allegedly fraudulent monetary transfer."  492
U. S., at 36.  In doing so, the Court noted that actions to
recover such transfers through a claim of fraudulent con-
veyance were traditionally available at common law.  See

──────────

[8]The majority leaves open the possibility that *Granfinanciera* might
have overruled *Atlas Roofing*.  See *ante,* at 22–23.  That suggestion
strains credulity.  By my count, *Granfinanciera* favorably cites to *Atlas
Roofing* at least 12 times.  See 492 U. S., at 48, 51–54, 57, 60–61; see also
*id.*, at 65 (Scalia, J., concurring in part and concurring in judgment).  It
even reaffirmed the definition of public rights from *Atlas Roofing*, declar-
ing that the Court "adhere[d] to that general teaching . . . in *Atlas Roof-
ing.*"  492 U. S., at 51.  The majority's only response is to say that Justice
White thought *Granfinanciera* may have overruled *Atlas Roofing.*  See
*ante,* at 23, n. 3; see also *ante,* at 17 (GORSUCH, J., concurring).  That is
misleading at best.  When Justice White said in his *Granfinanciera* dis-
sent that the Court's opinion in that case could be read as overruling or
limiting portions of several cases, including *Atlas Roofing*, he was refer-
ring to his understanding that *Atlas Roofing* also extended to private
disputes.  See *Granfinanciera*, 492 U. S., at 79–83; see also Tr. of Oral
Arg. 58–59 (Principal Deputy Solicitor General explaining that Justice
White understood "*Atlas Roofing* to speak [also] to the private parties
cases," not just to cases involving the Government, which "is really a
through line that the Court has never questioned").  With respect to
claims involving the Government, such as those at issue here, *Granfi-
nanciera* expressly reaffirmed *Atlas Roofing* and "adhere[d] to [its] gen-
eral teaching."  492 U. S., at 51.

*id.*, at 43–49. That did not resolve the case, however. Unlike in *Tull*, the proceeding at issue in *Granfinanciera* was in a non-Article III forum (*i.e.*, a bankruptcy court). So, to answer whether Congress could assign the fraudulent-conveyance claim to a bankruptcy judge for decision, Congress needed to decide whether the "legal cause of action involve[d] 'public rights.'" 492 U. S., at 53.

*Granfinanciera* explains that there are two ways to identify a "public right." First, there are the matters in which Congress enacts a statutory cause of action that "inheres in, or lies against, the Federal Government in its sovereign capacity." *Id.*, at 53 (citing *Atlas Roofing*, 430 U. S., at 458). These matters necessarily arise between the Government and the people in connection with the Government's exercise of its constitutional authority. See *supra,* at 7–8. In these cases, the Court said, *Atlas Roofing* controls the public-rights analysis. See *Granfinanciera*, 492 U. S., at 51, 53. The Court explained that "Congress may effectively supplant a common law cause of action carrying with it a right to a jury trial with a statutory cause of action shorn of a jury trial right if that statutory cause of action inheres in, or lies against, the Federal Government in its sovereign capacity." *Id.*, at 53 (citing *Atlas Roofing*, 430 U. S., at 458).

The second kind of public right that *Granfinanciera* recognized involves "disputes to which the Federal Government is not a party in its sovereign capacity," 492 U. S., at 55, n. 10, that is, usually "[w]holly private" disputes, *id.*, at 51. The public-rights analysis in these private-dispute cases looks different: "The crucial question, *in cases not involving the Federal Government*, is whether 'Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, has created a seemingly "private" right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary.'" *Id.*, at 54 (quoting *Thomas*, 473 U. S., at 593–594;

emphasis added; alterations omitted).

These two approaches together stand for the proposition that "[i]f a statutory right is not closely intertwined with a federal regulatory program Congress has power to enact, *and* if that right neither belongs to nor exists against the Federal Government, then it must be adjudicated by an Article III court." 492 U. S., at 54–55 (emphasis added). Once in federal court, "[i]f the right is legal in nature, then it carries with it the Seventh Amendment's guarantee of a jury trial." *Id.*, at 55.

Because *Granfinanciera* did not involve a statutory right that belonged to the Government in its sovereign capacity, *Atlas Roofing* did not control the outcome. Instead, the Court applied the private-disputes test to determine whether fraudulent-conveyance "actions were 'closely intertwined' with the bankruptcy regime." *Ante*, at 20 (quoting *Granfinanciera*, 492 U. S., at 54). The Court held that the fraudulent-conveyance actions "were not inseparable from the bankruptcy process," and thus the public-rights exception did not apply. *Ante*, at 20 (citing *Granfinanciera*, 492 U. S., at 54, 56).

The majority brushes aside this critical distinction between *Atlas Roofing* and *Granfinanciera* in one sentence. That "the Government is the party prosecuting this action," the majority writes, is meaningless because this Court has "never held that the 'presence of the United States as a proper party to the proceeding is . . . sufficient' by itself to trigger the exception." *Ante*, at 22 (quoting *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 69, n. 23 (1982) (plurality opinion)). Here, too, the majority attacks a strawman. The SEC does not claim that the mere presence of the United States as a proper party necessarily means that a public right is at issue. See Reply Brief 8, n. 2 (disclaiming this argument).[9] Of course "what matters is

––––––––––

[9] Indeed, "the public-rights doctrine does not extend to any criminal

the substance" of the claim. *Ante*, at 21.

By no means, though, does this case involve a "purely tax-onomic change." *Granfinanciera*, 492 U. S., at 61. Congress did not just repackage a common-law claim under a new label. It created new statutory obligations and an entire federal scheme. See *supra*, at 14–16.[10] Perhaps most importantly, Congress created a new right unknown to the common law that, unlike common-law fraud, belongs to the public and inheres in the Government in its sovereign capacity. That is why, when the SEC seeks to enforce the federal-securities laws, it does so to remedy the harm to the United States. See *supra*, at 16. It seeks to protect the integrity of the securities market as a whole through the imposition of new and distinct remedies like civil penalties

——————

matters, although the Government is a proper party." *Northern Pipeline Constr. Co.*, 458 U. S., at 70, n. 24 (plurality opinion) (citing *United States ex rel. Toth* v. *Quarles*, 350 U. S. 11 (1955)). That is so not only because this Court has held as much, but also because Article III itself prescribes that "[t]he trial of all Crimes, except in Cases of Impeachment, shall be by Jury." §2, cl. 3. In other words, Article III requires criminal trials to take place before a jury in federal court, but says nothing about civil-penalty claims brought by the Government. Beyond criminal trials, the Solicitor General also concedes that, under this Court's precedents, the public-rights doctrine does not apply when the Government brings a common-law claim in a proprietary capacity. See Reply Brief 8, n. 2.

[10]The majority spills much ink on the perceived similarities between federal-securities fraud and common-law fraud, only to conclude that the causes of action are not identical. That conclusion was inevitable because of critical differences between the two. Even if Congress drew upon common-law fraud when it enacted federal-securities laws, see *ante,* at 11–12, this Court has repeatedly disclaimed any suggestion that Congress federalized a common-law fraud claim. See, *e.g.*, *Stoneridge Investment Partners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U. S. 148, 162 (2008) ("Section 10(b) does not incorporate common-law fraud into federal law"); *SEC* v. *Zandford*, 535 U. S. 813, 820 (2002) ("[T]he statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of §10(b)"); *Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 388–389 (1983) ("[T]he antifraud provisions of the securities laws are not coextensive with common-law doctrines of fraud").

and orders barring violators from holding certain positions and performing certain activities in the industry. See 15 U. S. C. §§77h–1(f), and (g), 78u–2, 78u–3(f).

For these reasons, "[a]n action brought by an Executive Branch agency to enforce federal securities laws is not the same as an action brought by one individual against another for monetary or injunctive relief of the sort that law courts (with juries) in England or the States have traditionally heard." Brief for Professor John Golden et al. as *Amici Curiae* 3. Congress did not unlawfully "siphon" a traditional legal action "away from an Article III court" when it enacted the federal-securities laws and provided for their enforcement within the SEC. *Ante,* at 21.

The majority asserts that "*Granfinanciera* effectively decides this case." *Ante,* at 20. That can only be true, though, if one ignores what *Granfinanciera* actually says: Its public-rights analysis of whether an action is closely intertwined with a federal regulatory program only applies "in cases not involving the Federal Government." 492 U. S., at 54. The analysis from *Atlas Roofing* controls where, as here, "'the Government is involved in its sovereign capacity under an otherwise valid statute.'" 492 U. S., at 51 (quoting *Atlas Roofing*, 430 U. S., at 458).

## C

Both cases relied on by the majority, *Tull* and *Granfinanciera*, reaffirm that *Atlas Roofing* controls precisely in circumstances like the ones at issue in this case. That is why the majority's late-stage attempt to distinguish *Atlas Roofing* fails. The majority's principal argument that the OSHA scheme in *Atlas Roofing* "did not borrow its cause of action from the common law" and was instead a "self-consciously novel" scheme that "resembled a detailed building code," *ante,* at 23–24, is flawed on multiple fronts.

First, OSHA's cause of action should be largely irrelevant under the majority's view that the remedy of civil penalties

is effectively dispositive under *Tull*. *Atlas Roofing*, and
many other cases involving non-Article III adjudications,
also involved civil penalties designed to punish and deter,
and yet the majority does not expressly disavow them. Log-
ically, then, either *Atlas Roofing* and countless other cases
were wrongly decided, or the majority's view on civil penal-
ties is wrong.

Second, because the majority elides the critical distinc-
tion between *Atlas Roofing* and *Granfinanciera*, it fails to
grapple with the fact that this case, like *Atlas Roofing* and
unlike *Granfinanciera*, involves the Government acting in
its sovereign capacity to enforce a statutory violation. That
makes the right at issue a "public right" that Congress can
take outside the purview of Article III, even when the new
cause of action is analogous to a common-law claim.

Third, the relationship between the federal-securities
laws (including their antifraud provisions) and common-
law fraud is materially indistinguishable from the relation-
ship between OSHA and the common-law torts of wrongful
death and negligence. Unlike their common-law compara-
tors, neither statute requires actionable harm to an individ-
ual. See *supra*, at 15. In arguing that OSHA's scheme was
"self-consciously" novel in ways unknown to the common
law, the majority points to the granularity of OSHA stand-
ards. *Ante,* at 23–24. Yet lawyers and regulated parties in
the securities industry would be surprised to hear that this
could be a distinguishing feature. Anyone familiar with the
industry knows securities laws are replete with specific and
exceedingly detailed requirements implementing the stat-
ute's disclosure and antifraud provisions. See, *e.g.*, 17 CFR
§275.206(4)–1(b) (2023) (prohibiting testimonials and en-
dorsements that do not satisfy requirements without meet-
ing complex disclosure requirements); §275.206(4)–2(a)
(prohibiting investment advisers from having custody of cli-
ent funds or securities unless specific requirements are

met, including qualifications, notices, and account statements).

The majority further rests on the notion that Congress drew inspiration from the common law in enacting the antifraud provisions of the federal-securities laws, whereas OSHA's new statutory duty did not bring any common-law soil with it. See *ante,* at 23–24. Yet both statutes share elements with claims at common law that Congress deemed inadequate to address the national problems that prompted it to legislate. See *supra*, at 14–15. Still, even accepting that federal-securities laws bring common-law soil with them and OSHA does not, the majority does not explain why that is a constitutionally relevant distinction.[11]

In sum, all avenues by which the majority attempts to distinguish *Atlas Roofing* fail. The majority cannot escape the entrenched principle that a "legal cause of action involves 'public rights'" that can be taken outside of Article III if the "statutory right is . . . closely intertwined with a federal regulatory program Congress has power to enact" *or* if it "belongs to [o]r exists against the Federal Government." *Granfinanciera*, 492 U. S., at 53–54.[12] In both *Atlas Roofing* and this case, a public right exists. In both statutory

_____

[11] In *Tull* v. *United States*, 481 U. S. 412 (1987), for example, there was no common-law soil brought into that federal regulatory regime, and the Seventh Amendment still applied. Indeed, no one can argue that "[t]he purpose of [the Clean Water Act] was . . . to enable the Federal Government to bring or adjudicate claims that traced their ancestry to the common law." *Ante*, at 23–24.

[12] The concurrence's assertion that the majority is "follow[ing] the advice of Justices Brennan and Marshall" by "'limit[ing] the judicial authority of non-Article III federal tribunals'" is misleading. *Ante,* at 20 (quoting *Schor*, 478 U. S., at 859 (Brennan, J., joined by Marshall, J., dissenting)). Justice Brennan in his *Schor* dissent wrote that he would limit the authority of non-Article III tribunals to three recognized exceptions: (1) territorial courts; (2) courts-martial; and (3) forums adjudicating public-rights matters. As examples of the public-rights category, Justice Brennan cited *Murray's Lessee*, *Ex parte Bakelite*, *Crowell*, *Thomas*, and his plurality opinion in *Northern Pipeline*. See *Schor*, 478 U. S., at

schemes, regardless of any perceived resemblance to the common law, Congress enacted a new cause of action that created a statutory right belonging to the United States for the Government to enforce pursuant to its sovereign powers.

## IV

A faithful and straightforward application of this Court's longstanding precedent should have resolved this case. Faithful "[a]dherence to precedent is 'a foundation stone of the rule of law.'" *Kisor* v. *Wilkie*, 588 U. S. 558, 586 (2019) (quoting *Michigan* v. *Bay Mills Indian Community*, 572 U. S. 782, 798 (2014)). It allows courts to function, and be perceived, as courts, and not as political entities. "'It promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.'" 588 U. S., at 586–587 (quoting *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991); alterations omitted). That is why, "even in constitutional cases, a departure from precedent 'demands special justification.'" *Gamble* v. *United States*, 587 U. S. 678, 691 (2019) (quoting *Arizona* v. *Rumsey*, 467 U. S. 203, 212 (1984)).

Today's decision disregards these foundational principles.[13] Time will tell what is left of the public-rights doc-

_____

859. As those citations demonstrate, both Justices Brennan and Marshall certainly thought that public-rights matters extend to certain private disputes that do not involve the Government as a party, as well as disputes involving the Government in connection with different exercises of congressional power. Indeed, it was Justice Brennan who reaffirmed *Atlas Roofing* in his opinion for the *Granfinanciera* Court and explained that a public right includes, at a minimum, a statutory right that "belongs to [o]r exists against the Federal Government." 492 U. S., at 53–54.

[13] Precedents should not be so easily discarded based on the views of

trine. Less uncertain, however, are the momentous conse-
quences that flow from the majority's insistence that the
Government's rights to civil penalties must now be tried be-
fore a jury in federal court. The majority's decision, which
strikes down the SEC's in-house adjudication of civil-pen-
alty claims on the ground that such claims are legal in na-
ture and entitle respondents to a federal jury, effects a seis-
mic shift in this Court's jurisprudence. Indeed, "[i]f you've
never heard of a statute being struck down on that ground,"
and you recall having read countless cases approving of
that arrangement, "you're not alone." *Seila Law LLC* v.
*Consumer Financial Protection Bureau*, 591 U. S. 197, 294
(2020) (KAGAN, J., concurring in judgment with respect to
severability and dissenting in part).

The majority pulls a rug out from under Congress with-
out even acknowledging that its decision upends over two
centuries of settled Government practice. The United
States, led by then-Solicitor General Robert Bork and then-
Assistant Attorney General for the Civil Division Rex Lee,
told this Court in *Atlas Roofing* that "during the whole of
our history, regulatory fines and penalties have been col-
lected by non-jury procedures pursuant to . . . legislative de-
cisions," and that "[i]t would be most remarkable if, at this
late date, the Seventh Amendment were construed to out-
law this consistent rule of government followed for two cen-
turies." Brief for Respondents in *Atlas Roofing*, O. T. 1976,
No. 75–746, etc., pp. 81–82. This Court agreed and upheld
that practice, it seemed, once and for all.

─────────

some commentators, or on whether or not a particular case is "cele-
brated." *Ante*, at 25, n. 4. *Atlas Roofing* and the long line of cases before
it are precedents from this Court entitled to *stare decisis* effect. Indeed,
this Court has reaffirmed and repeatedly cited *Atlas Roofing* with ap-
proval. See, *e.g.*, *Oil States*, 584 U. S., at 344–345; *Stern*, 564 U. S., at
489–490; *Granfinanciera*, 492 U. S., at 48, 51–54, 60–61; *id.*, at 65–66
(Scalia, J., concurring in part and concurring in judgment); *Tull*, 481
U. S., at 418, n. 4; *Northern Pipeline Constr. Co.*, 458 U. S., at 67, n. 18,
69, n. 23, 70, 73, 77 (plurality opinion).

Following this Court's precedents and the recommendation of the Administrative Conference of the United States, Congress has enacted countless new statutes in the past 50 years that have empowered federal agencies to impose civil penalties for statutory violations. See 2 P. Verkuilm, D. Gifford, C. Koch, R. Pierce, & J. Lubbers, Administrative Conference of the United States, Recommendations and Reports, The Federal Administrative Judiciary 861, and nn. 350–351 (1992). These statutes are sometimes enacted in addition to, but often instead of, "the traditional civil enforcement statutes that permitted agencies to collect civil penalties only after federal district court trials." *Id.*, at 861. "By 1986, there were over 200 such statutes" and "[t]he trend has, if anything, accelerated" since then. *Id.*, at 861, and n. 351.

Similarly, there are, at the very least, more than two dozen agencies that can impose civil penalties in administrative proceedings. See Tr. of Oral Arg. 78–79 (Principal Deputy Solicitor General) (recognizing two dozen agencies with administrative civil-penalty authorities); see also, *e.g.*, 5 U. S. C. §1215(a)(3)(A)(ii) (Merit Systems Protection Board); 7 U. S. C. §§9(10)(C), 13a (Commodity Futures Trading Commission); §§499c(a), 586, 2279e(a) (Department of Agriculture); 8 U. S. C. §§1324c, 1324d (Department of Justice); 12 U. S. C. §§5563(a)(2), (c), (Consumer Financial Protection Bureau); 16 U. S. C. §823b(c) (Federal Energy Regulatory Commission); 20 U. S. C. §1082(g) (Department of Education); 21 U. S. C. §335b (Department of Health and Human Services/Food and Drug Administration); 29 U. S. C. §666(j) (Occupational Safety and Health Review Commission); 30 U. S. C. §§820(a) and (b) (Federal Mine Safety and Health Review Commission); 31 U. S. C. §5321(a)(2) (Department of the Treasury); 33 U. S. C. §§1319(d) and (g) (Environmental Protection Agency); 39 U. S. C. §3018(c) (Postal Service); 42 U. S. C. §3545(f) (Department of Housing and Urban Development); 46 U. S. C.

§41107(a) (Federal Maritime Commission); 47 U. S. C. §503(b)(3) (Federal Communications Commission); 49 U. S. C. §521 (Federal Railroad Administration); §46301 (Department of Transportation).

Some agencies, like the Consumer Financial Protection Bureau, the Environmental Protection Agency, and the SEC, can pursue civil penalties in both administrative proceedings and federal court. See, *e.g.*, 12 U. S. C. §§5563(a), 5564(a), 5565(a)(1), (2)(H), and (c) (Consumer Financial Protection Bureau); 33 U. S. C. §§1319(a), (b), and (g) (Environmental Protection Agency); *supra,* at 2 (SEC). Others do not have that choice. As the above-cited statutes confirm, the Occupational Safety and Health Review Commission, the Federal Energy Regulatory Commission, the Federal Mine Safety and Health Review Commission, the Department of Agriculture, and many others, can pursue civil penalties only in agency enforcement proceedings. For those and countless other agencies, all the majority can say is tough luck; get a new statute from Congress.

Against this backdrop, our coequal branches will be surprised to learn that the rule they thought long settled, and which remained unchallenged for half a century, is one that, according to the majority and the concurrence, my dissent just announced today. Unfortunately, that mistaken view means that the constitutionality of hundreds of statutes may now be in peril, and dozens of agencies could be stripped of their power to enforce laws enacted by Congress. Rather than acknowledge the earthshattering nature of its holding, the majority has tried to disguise it. The majority claims that its ruling is limited to "civil penalty suits for fraud" pursuant to a statute that is "barely over a decade old," *ante,* at 18, n. 2, 22, an assurance that is in significant tension with other parts of its reasoning. That incredible assertion should fool no one. Today's decision is a massive sea change. Litigants seeking further dismantling of the "administrative state" have reason to rejoice in their win

today, but those of us who cherish the rule of law have nothing to celebrate.

\*   \*   \*

Today's ruling is part of a disconcerting trend: When it comes to the separation of powers, this Court tells the American public and its coordinate branches that it knows best. See, *e.g.*, *Collins* v. *Yellen*, 594 U. S. 220, 227 (2021) (concluding that the Federal Housing Finance Agency's "structure violates the separation of powers" because the Agency was led by a single Director removable by the President only "'for cause'"); *United States* v. *Arthrex, Inc.*, 594 U. S. 1, 6, 23 (2021) (holding that "authority wielded by [Administrative Patent Judges] during inter partes review is incompatible with their appointment by the Secretary to an inferior office"); *Seila Law*, 591 U. S., at 202–205 (holding that "the structure of the [Consumer Financial Protection Bureau] violates the separation of powers" because it was led by a single Director removable by the President only "for cause"); *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 483–484, 492 (2010) (holding "that the dual for-cause limitations on the removal of [Public Company Accounting Oversight] Board members contravene the Constitution's separation of powers"). The Court tells Congress how best to structure agencies, vindicate harms to the public at large, and even provide for the enforcement of rights created for the Government. It does all of this despite the fact that, compared to its political counterparts, "the Judiciary possesses an inferior understanding of the realities of administration" and how "political power . . . operates." *Free Enterprise Fund*, 561 U. S., at 523 (Breyer, J., dissenting).

There are good reasons for Congress to set up a scheme like the SEC's. It may yield important benefits over jury trials in federal court, such as greater efficiency and expertise, transparency and reasoned decisionmaking, as well as

uniformity, predictability, and greater political accountability. See, *e.g.*, Brief for Administrative Law Scholars as *Amici Curiae* 30–32. Others may believe those benefits are overstated, and that a federal jury is a better check on government overreach. See, *e.g.*, Brief for Cato Institute as *Amicus Curiae* 11–25. Those arguments take place against the backdrop of a philosophical (and perhaps ideological) debate on whether the number of agencies and authorities properly corresponds to the ever-increasing and evolving problems faced by our society.

This Court's job is not to decide who wins this debate. These are policy considerations for Congress in exercising its legislative judgment and constitutional authority to decide how to tackle today's problems. It is the electorate, and the Executive to some degree, not this Court, that can and should provide a check on the wisdom of those judgments.

Make no mistake: Today's decision is a power grab. Once again, "the majority arrogates Congress's policymaking role to itself." *Garland* v. *Cargill*, 602 U. S. 406, 442 (2024) (SOTOMAYOR, J., dissenting). It prescribes artificial constraints on what modern-day adaptable governance must look like. In telling Congress that it cannot entrust certain public-rights matters to the Executive because it must bring them first into the Judiciary's province, the majority oversteps its role and encroaches on Congress's constitutional authority. Its decision offends the Framers' constitutional design so critical to the preservation of individual liberty: the division of our Government into three coordinate branches to avoid the concentration of power in the same hands. The Federalist No. 51, p. 349 (J. Cooke ed. 1961) (J. Madison). Judicial aggrandizement is as pernicious to the separation of powers as any aggrandizing action from either of the political branches.

Deeply entrenched in today's ruling is the erroneous belief that any "mistaken or wrongful exertion by the legislative department of its authority" can lead to "grave abuses"

and "it behooves the judiciary to apply a corrective by exceeding its own authority" through requiring civil-penalty claims to proceed before a federal jury. *Stranahan*, 214 U. S., at 340. As this Court said over a century ago in this public-rights context, that belief "mistakenly assumes that the courts can alone be safely intrusted with power, and that hence it is their duty to unlawfully exercise prerogatives which they have no right to exert, upon the assumption that wrong must be done to prevent wrong being accomplished." *Ibid.*

By giving respondents a jury trial, even one that the Constitution does not require, the majority may think that it is protecting liberty. That belief, too, is deeply misguided. The American People should not mistake judicial hubris with the protection of individual rights. Our first President understood this well. In his parting words to the Nation, he reminded us that a branch of Government arrogating for itself the power of another based on perceptions of what, "in one instance, may be the instrument of good . . . is the customary weapon by which free governments are destroyed." Farewell Address (1796), in 35 The Writings of George Washington 229 (J. Fitzpatrick ed. 1940) (footnote omitted). The majority today ignores that wisdom.

Because the Court disregards its own precedent and its coequal partners in our tripartite system of Government, I respectfully dissent.